CROSBY, SECRETARY OF ADMINISTRATION AND
FINANCE OF MASSACHUSETTS, ET AL. *v.*
NATIONAL FOREIGN TRADE COUNCIL

No. 99–474.  Argued March 22, 2000—Decided June 19, 2000

364

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 388.

*Thomas A. Barnico*, Assistant Attorney General of Massachusetts, argued the cause for petitioners. With him on the briefs were *Thomas F. Reilly*, Attorney General, and *James A. Sweeney*, Assistant Attorney General.

*Timothy B. Dyk* argued the cause for respondent. With him on the brief were *Gregory A. Castanias, John B. Kennedy*, and *Michael A. Collora*.

*Solicitor General Waxman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Barbara McDowell, Mark B. Stern, Alisa B. Klein, Douglas Hallward-Driemeier, David R. Andrews, Neal S. Wolin*, and *Andrew J. Pincus*.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arkansas et al. by *Heidi Heitkamp*, Attorney General of North Dakota, *Douglas A. Bahr*, Solicitor General, and *Beth Angus Baumstark*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *Earl I. Anzai* of Hawaii, *Richard P. Ieyoub* of Louisiana, *Andrew Ketterer* of Maine, *J. Joseph Curran, Jr.*, of Maryland, *Mike Hatch* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Philip T. McLaughlin* of New Hampshire, *John J. Farmer, Jr.*, of New Jersey, *Patricia A. Madrid* of New Mexico, *W. A.*

JUSTICE SOUTER delivered the opinion of the Court.

The issue is whether the Burma law of the Commonwealth of Massachusetts, restricting the authority of its agencies to purchase goods or services from companies doing business with Burma,[1] is invalid under the Supremacy Clause of the National Constitution owing to its threat of frustrating federal statutory objectives. We hold that it is.

I

In June 1996, Massachusetts adopted "An Act Regulating State Contracts with Companies Doing Business with or in

*Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *John Cornyn* of Texas, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the Council of State Governments et al. by *Richard Ruda* and *James I. Crowley;* for Senator Barbara Boxer et al. by *John Echeverria, Robert Stumberg,* and *Matthew C. Porterfield;* for the New York City Comptroller et al. by *Sara C. Kay* and *Jane R. Levine;* and for Alliance for Democracy et al. by *Deborah Anker.*

Briefs of *amici curiae* urging affirmance were filed for Representative Douglas Bereuter et al. by *John Vanderstar, Charles Clark, Eric D. Brown,* and *W. Thomas McCraney III;* for Associated Industries of Massachusetts et al. by *Michael F. Malamut;* for the Chamber of Commerce of the United States et al. by *Daniel M. Price, Robin S. Conrad, Jan Amundson,* and *Quentin Riegel;* for the European Communities et al. by *Richard L. A. Weiner* and *David G. Leitch;* for the Industry Coalition on Technology Transfer by *Eric L. Hirschhorn* and *Terence Murphy;* for the Washington Legal Foundation by *Daniel J. Popeo* and *R. Shawn Gunnarson;* and for Gerald R. Ford et al. by *Andrew N. Vollmer, Carol J. Banta, Martin S. Kaufman,* and *Edwin L. Lewis III.*

*Kenneth B. Clark* filed a brief for the Coalition for Local Sovereignty as *amicus curiae.*

[1] The Court of Appeals noted that the ruling military government of "Burma changed [the country's] name to Myanmar in 1989," but the court then said it would use the name Burma since both parties and *amici curiae,* the state law, and the federal law all do so. *National Foreign Trade Council* v. *Natsios,* 181 F. 3d 38, 45, n. 1 (CA1 1999). We follow suit, noting that our use of this term, like the First Circuit's, is not intended to express any political view. See *ibid.*

Burma (Myanmar)," 1996 Mass. Acts 239, ch. 130 (codified at Mass. Gen. Laws §§ 7:22G–7:22M, 40 F½ (1997). The statute generally bars state entities from buying goods or services from any person (defined to include a business organization) identified on a "restricted purchase list" of those doing business with Burma. §§ 7:22H(a), 7:22J. Although the statute has no general provision for waiver or termination of its ban, it does exempt from boycott any entities present in Burma solely to report the news, § 7:22H(e), or to provide international telecommunication goods or services, *ibid.*, or medical supplies, § 7:22I.

"'Doing business with Burma'" is defined broadly to cover any person

"(a) having a principal place of business, place of incorporation or its corporate headquarters in Burma (Myanmar) or having any operations, leases, franchises, majority-owned subsidiaries, distribution agreements, or any other similar agreements in Burma (Myanmar), or being the majority-owned subsidiary, licensee or franchise of such a person;

"(b) providing financial services to the government of Burma (Myanmar), including providing direct loans, underwriting government securities, providing any consulting advice or assistance, providing brokerage services, acting as a trustee or escrow agent, or otherwise acting as an agent pursuant to a contractual agreement;

"(c) promoting the importation or sale of gems, timber, oil, gas or other related products, commerce in which is largely controlled by the government of Burma (Myanmar), from Burma (Myanmar);

"(d) providing any goods or services to the government of Burma (Myanmar)." § 7:22G.

There are three exceptions to the ban: (1) if the procurement is essential, and without the restricted bid, there would be no bids or insufficient competition, § 7:22H(b); (2) if the

procurement is of medical supplies, §7:22I; and (3) if the procurement efforts elicit no "comparable low bid or offer" by a person not doing business with Burma, §7:22H(d), meaning an offer that is no more than 10 percent greater than the restricted bid, §7:22G. To enforce the ban, the Act requires petitioner Secretary of Administration and Finance to maintain a "restricted purchase list" of all firms "doing business with Burma,"[2] §7:22J.

In September 1996, three months after the Massachusetts law was enacted, Congress passed a statute imposing a set of mandatory and conditional sanctions on Burma. See Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1997, §570, 110 Stat. 3009-166 to 3009-167 (enacted by the Omnibus Consolidated Appropriations Act, 1997, §101(c), 110 Stat. 3009-121 to 3009-172). The federal Act has five basic parts, three substantive and two procedural.

First, it imposes three sanctions directly on Burma. It bans all aid to the Burmese Government except for humanitarian assistance, counternarcotics efforts, and promotion of human rights and democracy. §570(a)(1). The statute instructs United States representatives to international financial institutions to vote against loans or other assistance to or for Burma, §570(a)(2), and it provides that no entry visa shall be issued to any Burmese Government official unless required by treaty or to staff the Burmese mission to the United Nations, §570(a)(3). These restrictions are to remain in effect "[u]ntil such time as the President determines and certifies to Congress that Burma has made measurable and substantial progress in improving human rights practices and implementing democratic government." §570(a).

---

[2] According to the District Court, companies may challenge their inclusion on the list by submitting an affidavit stating that they do no business with Burma. *National Foreign Trade Council* v. *Baker*, 26 F. Supp. 2d 287, 289 (Mass. 1998). The Massachusetts Executive Office's Operational Services Division makes a final determination. *Ibid.*

Second, the federal Act authorizes the President to impose further sanctions subject to certain conditions. He may prohibit "United States persons" from "new investment" in Burma, and shall do so if he determines and certifies to Congress that the Burmese Government has physically harmed, rearrested, or exiled Daw Aung San Suu Kyi (the opposition leader selected to receive the Nobel Peace Prize), or has committed "large-scale repression of or violence against the Democratic opposition." § 570(b). "New investment" is defined as entry into a contract that would favor the "economical development of resources located in Burma," or would provide ownership interests in or benefits from such development, § 570(f)(2), but the term specifically excludes (and thus excludes from any Presidential prohibition) "entry into, performance of, or financing of a contract to sell or purchase goods, services, or technology," *ibid.*

Third, the statute directs the President to work to develop "a comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma." § 570(c). He is instructed to cooperate with members of the Association of Southeast Asian Nations (ASEAN) and with other countries having major trade and investment interests in Burma to devise such an approach, and to pursue the additional objective of fostering dialogue between the ruling State Law and Order Restoration Council (SLORC) and democratic opposition groups. *Ibid.*

As for the procedural provisions of the federal statute, the fourth section requires the President to report periodically to certain congressional committee chairmen on the progress toward democratization and better living conditions in Burma as well as on the development of the required strategy. § 570(d). And the fifth part of the federal Act authorizes the President "to waive, temporarily or permanently, any sanction [under the federal Act] . . . if he determines and certifies to Congress that the application of such sanction

would be contrary to the national security interests of the United States." §570(e).

On May 20, 1997, the President issued the Burma Executive Order, Exec. Order No. 13047, 3 CFR 202 (1997 Comp.). He certified for purposes of §570(b) that the Government of Burma had "committed large-scale repression of the democratic opposition in Burma" and found that the Burmese Government's actions and policies constituted "an unusual and extraordinary threat to the national security and foreign policy of the United States," a threat characterized as a national emergency. The President then prohibited new investment in Burma "by United States persons," Exec. Order No. 13047, §1, any approval or facilitation by a United States person of such new investment by foreign persons, §2(a), and any transaction meant to evade or avoid the ban, §2(b). The order generally incorporated the exceptions and exemptions addressed in the statute. §§3, 4. Finally, the President delegated to the Secretary of State the tasks of working with ASEAN and other countries to develop a strategy for democracy, human rights, and the quality of life in Burma, and of making the required congressional reports.[3] §5.

## II

Respondent National Foreign Trade Council (Council) is a nonprofit corporation representing companies engaged in foreign commerce; 34 of its members were on the Massachusetts restricted purchase list in 1998. *National Foreign Trade Council* v. *Natsios*, 181 F. 3d 38, 48 (CA1 1999). Three withdrew from Burma after the passage of the state Act, and one member had its bid for a procurement contract increased by 10 percent under the provision of the state law

---

[3] The President also delegated authority to implement the policy to the Secretary of the Treasury, in consultation with the Secretary of State. §6. On May 21, 1998, the Secretary of the Treasury issued federal regulations implementing the President's Executive Order. See 31 CFR pt. 537 (1999) (Burmese Sanctions Regulations).

allowing acceptance of a low bid from a listed bidder only if the next-to-lowest bid is more than 10 percent higher.   *Ibid.*

In April 1998, the Council filed suit in the United States District Court for the District of Massachusetts, seeking declaratory and injunctive relief against the petitioner state officials charged with administering and enforcing the state Act (whom we will refer to simply as the State).[4]   The Council argued that the state law unconstitutionally infringed on the federal foreign affairs power, violated the Foreign Commerce Clause, and was preempted by the federal Act.   After detailed stipulations, briefing, and argument, the District Court permanently enjoined enforcement of the state Act, holding that it "unconstitutionally impinge[d] on the federal government's exclusive authority to regulate foreign affairs."   *National Foreign Trade Council* v. *Baker*, 26 F. Supp. 2d 287, 291 (Mass. 1998).

The United States Court of Appeals for the First Circuit affirmed on three independent grounds.   181 F. 3d, at 45. It found the state Act unconstitutionally interfered with the foreign affairs power of the National Government under *Zschernig* v. *Miller*, 389 U. S. 429 (1968), see 181 F. 3d, at 52–55; violated the dormant Foreign Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, see 181 F. 3d, at 61–71; and was preempted by the congressional Burma Act, see *id.*, at 71–77.

The State's petition for certiorari challenged the decision on all three grounds and asserted interests said to be shared by other state and local governments with similar measures.[5] Though opposing certiorari, the Council acknowledged the

---

[4] One of the state offices changed incumbents twice during litigation before reaching this Court, see *National Foreign Trade Council* v. *Natsios*, 181 F. 3d 38, 48, n. 4 (CA1 1999), and once more after we granted certiorari.

[5] "At least nineteen municipal governments have enacted analogous laws restricting purchases from companies that do business in Burma." *Id.*, at 47; Pet. for Cert. 13 (citing N. Y. C. Admin. Code § 6–115 (1999); Los Angeles Admin. Code, Art. 12, § 10.38 *et seq.* (1999); Philadelphia Code § 17–104(b) (1999); Vermont H. J. Res. 157 (1998); 1999 Vt. Laws No. 13).

significance of the issues and the need to settle the constitutionality of such laws and regulations. Brief in Opposition 18–19. We granted certiorari to resolve these important questions, 528 U. S. 1018 (1999), and now affirm.

## III

A fundamental principle of the Constitution is that Congress has the power to preempt state law. Art. VI, cl. 2; *Gibbons* v. *Ogden,* 9 Wheat. 1, 211 (1824); *Savage* v. *Jones,* 225 U. S. 501, 533 (1912); *California* v. *ARC America Corp.,* 490 U. S. 93, 101 (1989). Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances. When Congress intends federal law to "occupy the field," state law in that area is preempted. *Id.,* at 100; cf. *United States* v. *Locke,* 529 U. S. 89, 115 (2000) (citing *Charleston & Western Carolina R. Co.* v. *Varnville Furniture Co.,* 237 U. S. 597, 604 (1915)). And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute.[6] *Hines* v. *Davidowitz,* 312 U. S. 52, 66–67 (1941); *ARC America Corp., supra,* at 100–101; *Locke, supra,* at 109. We will find preemption where it is impossible for a private party to comply with both state and federal law, see, *e. g., Florida Lime & Avocado Growers, Inc.* v.

---

[6] We recognize, of course, that the categories of preemption are not "rigidly distinct." *English* v. *General Elec. Co.,* 496 U. S. 72, 79, n. 5 (1990). Because a variety of state laws and regulations may conflict with a federal statute, whether because a private party cannot comply with both sets of provisions or because the objectives of the federal statute are frustrated, "field pre-emption may be understood as a species of conflict pre-emption," *id.,* at 79–80, n. 5; see also *Gade* v. *National Solid Wastes Management Assn.,* 505 U. S. 88, 104, n. 2 (1992) (quoting *English, supra*); 505 U. S., at 115–116 (SOUTER, J., dissenting) (noting similarity between "purpose-conflict pre-emption" and preemption of a field, and citing L. Tribe, American Constitutional Law 486 (2d ed. 1988)); 1 L. Tribe, American Constitutional Law 1177 (3d ed. 2000) (noting that *"field"* preemption may fall into any of the categories of express, implied, or conflict preemption).

*Paul*, 373 U. S. 132, 142–143 (1963), and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines, supra*, at 67. What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects:

> "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage, supra*, at 533, quoted in *Hines, supra*, at 67, n. 20.

Applying this standard, we see the state Burma law as an obstacle to the accomplishment of Congress's full objectives under the federal Act.[7] We find that the state law undermines the intended purpose and "natural effect" of at least three provisions of the federal Act, that is, its delegation of effective discretion to the President to control economic

---

[7] The State concedes, as it must, that in addressing the subject of the federal Act, Congress has the power to preempt the state statute. See Reply Brief for Petitioners 2; Tr. of Oral Arg. 5–6.

We add that we have already rejected the argument that a State's "statutory scheme . . . escapes pre-emption because it is an exercise of the State's spending power rather than its regulatory power." *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282, 287 (1986). In *Gould*, we found that a Wisconsin statute debarring repeat violators of the National Labor Relations Act, 29 U. S. C. § 151 *et seq.*, from contracting with the State was preempted because the state statute's additional enforcement mechanism conflicted with the federal Act. 475 U. S., at 288–289. The fact that the State "ha[d] chosen to use its spending power rather than its police power" did not reduce the potential for conflict with the federal statute. *Ibid.*

sanctions against Burma, its limitation of sanctions solely to United States persons and new investment, and its directive to the President to proceed diplomatically in developing a comprehensive, multilateral strategy toward Burma.[8]

## A

First, Congress clearly intended the federal Act to provide the President with flexible and effective authority over economic sanctions against Burma. Although Congress immediately put in place a set of initial sanctions (prohibiting bilateral aid, §570(a)(1), support for international financial assistance, §570(a)(2), and entry by Burmese officials into the United States, §570(a)(3)), it authorized the President to terminate any and all of those measures upon determining and certifying that there had been progress in human rights and democracy in Burma. §570(a). It invested the President with the further power to ban new investment by United States persons, dependent only on specific Presidential findings of repression in Burma. §570(b). And, most significantly, Congress empowered the President "to waive, temporarily or permanently, any sanction [under the federal Act] . . . if he determines and certifies to Congress that the application of such sanction would be contrary to the national security interests of the United States." §570(e).

---

[8] We leave for another day a consideration in this context of a presumption against preemption. See *United States* v. *Locke,* 529 U. S. 89, 108 (2000). Assuming, *arguendo,* that some presumption against preemption is appropriate, we conclude, based on our analysis below, that the state Act presents a sufficient obstacle to the full accomplishment of Congress's objectives under the federal Act to find it preempted. See *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941).

Because our conclusion that the state Act conflicts with federal law is sufficient to affirm the judgment below, we decline to speak to field preemption as a separate issue, see n. 6, *supra,* or to pass on the First Circuit's rulings addressing the foreign affairs power or the dormant Foreign Commerce Clause. See *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (concurring opinion).

This express investiture of the President with statutory authority to act for the United States in imposing sanctions with respect to the Government of Burma, augmented by the flexibility[9] to respond to change by suspending sanctions in the interest of national security, recalls Justice Jackson's observation in *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952): "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." See also *id.*, at 635–636, n. 2 (noting that the President's power in the area of foreign relations is least restricted by Congress and citing *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304 (1936)). Within the sphere defined by Congress, then, the statute has placed the President in a position with as much discretion to exercise economic leverage against Burma, with an eye toward national security, as our law will

---

[9] Statements by the sponsors of the federal Act underscore the statute's clarity in providing the President with flexibility in implementing its Burma sanctions policy. See 142 Cong. Rec. 19212 (1996) (statement of principal sponsor Sen. Cohen) (emphasizing importance of providing "the administration flexibility in reacting to changes, both positive and negative, with respect to the behavior of the [Burmese regime]); *id.*, at 19213; *id.*, at 19221 (statement of cosponsor Sen. McCain) (describing the federal Act as "giv[ing] the President, who, whether Democrat or Republican, is charged with conducting our Nation's foreign policy, some flexibility"); *id.*, at 19220 (statement of cosponsor Sen. Feinstein) ("We need to be able to have the flexibility to remove sanctions and provide support for Burma if it reaches a transition stage that is moving toward the restoration of democracy, which all of us support"). These sponsors chose a pliant policy with the explicit support of the Executive. See, *e. g., id.*, at 19219 (letter from Barbara Larkin, Assistant Secretary, Legislative Affairs, U. S. Department of State to Sen. Cohen) (admitted by unanimous consent) ("We believe the current and conditional sanctions which your language proposes are consistent with Administration policy. As we have stated on several occasions in the past, we need to maintain our flexibility to respond to events in Burma and to consult with Congress on appropriate responses to ongoing and future development there").

admit. And it is just this plenitude of Executive authority that we think controls the issue of preemption here. The President has been given this authority not merely to make a political statement but to achieve a political result, and the fullness of his authority shows the importance in the congressional mind of reaching that result. It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action.[10]

And that is just what the Massachusetts Burma law would do in imposing a different, state system of economic pressure against the Burmese political regime. As will be seen, the state statute penalizes some private action that the federal Act (as administered by the President) may allow, and pulls levers of influence that the federal Act does not reach. But the point here is that the state sanctions are immediate,[11] see 1996 Mass. Acts 239, ch. 130, § 3 (restricting all contracts after law's effective date); Mass. Gen. Laws § 7:22K (1997)

---

[10] The State makes arguments that could be read to suggest that Congress's objective of Presidential flexibility was limited to discretion solely over the sanctions in the federal Act, and that Congress implicitly left control over state sanctions to the State. Brief for Petitioners 19–24. We reject this cramped view of Congress's intent as against the weight of the evidence. Congress made no explicit statement of such limited objectives. More importantly, the federal Act itself strongly indicates the opposite. For example, under the federal Act, Congress explicitly identified protecting "national security interests" as a ground on which the President could suspend federal sanctions. § 570(e), 110 Stat. 3009–167. We find it unlikely that Congress intended both to enable the President to protect national security by giving him the flexibility to suspend or terminate federal sanctions and simultaneously to allow Massachusetts to act at odds with the President's judgment of what national security requires.

[11] These provisions strongly resemble the immediate sanctions on investment that appeared in the proposed section of H. R. 3540 that Congress rejected in favor of the federal Act. See H. R. 3540, 104th Cong., 2d Sess., § 569(1) (1996).

(authorizing regulations for timely and effective implementation), and perpetual, there being no termination provision, see, *e. g.*, § 7:22J (restricted companies list to be updated at least every three months). This unyielding application undermines the President's intended statutory authority by making it impossible for him to restrain fully the coercive power of the national economy when he may choose to take the discretionary action open to him, whether he believes that the national interest requires sanctions to be lifted, or believes that the promise of lifting sanctions would move the Burmese regime in the democratic direction. Quite simply, if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence. In *Dames & Moore* v. *Regan*, 453 U. S. 654 (1981), we used the metaphor of the bargaining chip to describe the President's control of funds valuable to a hostile country, *id.*, at 673; here, the state Act reduces the value of the chips created by the federal statute.[12] It thus "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U. S., at 67.

## B

Congress manifestly intended to limit economic pressure against the Burmese Government to a specific range. The federal Act confines its reach to United States persons, § 570(b), imposes limited immediate sanctions, § 570(a), places only a conditional ban on a carefully defined area of "new investment," § 570(f)(2), and pointedly exempts contracts to sell or purchase goods, services, or technology, § 570(f)(2). These detailed provisions show that Congress's calibrated

---

[12] The sponsors of the federal Act obviously anticipated this analysis. See, *e. g.*, 142 Cong. Rec., at 19220 (statement of Sen. Feinstein) ("We may be able to have the effect of nudging the SLORC toward an increased dialog with the democratic opposition. That is why we also allow the President to lift sanctions").

Burma policy is a deliberate effort "to steer a middle path," *id.*, at 73.[13]

The State has set a different course, and its statute conflicts with federal law at a number of points by penalizing individuals and conduct that Congress has explicitly exempted or excluded from sanctions. While the state Act differs from the federal in relying entirely on indirect economic leverage through third parties with Burmese connections, it otherwise stands in clear contrast to the congressional scheme in the scope of subject matter addressed. It restricts all contracts between the State and companies doing business in Burma, § 7:22H(a), except when purchasing medical supplies and other essentials (or when short of comparable bids), § 7:22I. It is specific in targeting contracts to pro-

---

[13] The fact that Congress repeatedly considered and rejected targeting a broader range of conduct lends additional support to our view. Most importantly, the federal Act, as passed, replaced the original proposed section of H. R. 3540, which barred "any investment in Burma" by a United States national without exception or limitation. See H. R. 3540, *supra*, § 569(1). Congress also rejected a competing amendment, S. 1511, 104th Cong., 1st Sess. (Dec. 29, 1995), which similarly provided that "United States nationals shall not make any investment in Burma," § 4(b)(1), and would have permitted the President to impose conditional sanctions on the importation of "articles which are produced, manufactured, grown, or extracted in Burma," § 4(c)(1), and would have barred all travel by United States nationals to Burma, § 4(c)(2). Congress had rejected an earlier amendment that would have prohibited all United States investment in Burma, subject to the President's power to lift sanctions. S. 1092, 104th Cong., 1st Sess. (July 28, 1995).

Statements of the sponsors of the federal Act also lend weight to the conclusions that the limits were deliberate. See, *e. g.*, 142 Cong. Rec., at 19279 (statement of Sen. Breaux) (characterizing the federal Act as "strik[ing] a balance between unilateral sanctions against Burma and unfettered United States investment in that country"). The scope of the exemptions was discussed, see *ibid.* (statements of Sens. Nickles and Cohen), and broader sanctions were rejected, see *id.*, at 19212 (statement of Sen. Cohen); *id.*, at 19280 (statement of Sen. Murkowski) ("Instead of the current draconian sanctions proposed in the legislation before us, we should adopt an approach that effectively secures our national interests").

vide financial services, § 7:22G(b), and general goods and services, § 7:22G(d), to the Government of Burma, and thus prohibits contracts between the State and United States persons for goods, services, or technology, even though those transactions are explicitly exempted from the ambit of new investment prohibition when the President exercises his discretionary authority to impose sanctions under the federal Act. § 570(f)(2).

As with the subject of business meant to be affected, so with the class of companies doing it: the state Act's generality stands at odds with the federal discreteness. The Massachusetts law directly and indirectly imposes costs on all companies that do any business in Burma, § 7:22G, save for those reporting news or providing international telecommunications goods or services, or medical supplies, §§ 7:22H(e), 7:22I. It sanctions companies promoting the importation of natural resources controlled by the Government of Burma, or having any operations or affiliates in Burma. § 7:22G. The state Act thus penalizes companies with pre-existing affiliates or investments, all of which lie beyond the reach of the federal Act's restrictions on "new investment" in Burmese economic development. §§ 570(b), 570(f)(2). The state Act, moreover, imposes restrictions on foreign companies as well as domestic, whereas the federal Act limits its reach to United States persons.

The conflicts are not rendered irrelevant by the State's argument that there is no real conflict between the statutes because they share the same goals and because some companies may comply with both sets of restrictions. See Brief for Petitioners 21–22. The fact of a common end hardly neutralizes conflicting means,[14] see *Gade* v. *National Solid*

---

[14] The State's reliance on *CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 82–83 (1987), for the proposition that "[w]here the state law furthers the purpose of the federal law, the Court should not find conflict" is misplaced. See Brief for Petitioners 21–22. In *CTS Corp.*, we found that an Indiana state securities law "further[ed] the federal policy of investor

*Wastes Management Assn.*, 505 U. S. 88, 103 (1992), and the fact that some companies may be able to comply with both sets of sanctions does not mean that the state Act is not at odds with achievement of the federal decision about the right degree of pressure to employ. See *Hines,* 312 U. S., at 61 ("The basic subject of the state and federal laws is identical"); *id.,* at 67 (finding conflict preemption). " '[C]onflict is imminent' " when " 'two separate remedies are brought to bear on the same activity,' " *Wisconsin Dept. of Industry* v. *Gould Inc.,* 475 U. S. 282, 286 (1986) (quoting *Garner* v. *Teamsters,* 346 U. S. 485, 498–499 (1953)). Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force.

## C

Finally, the state Act is at odds with the President's intended authority to speak for the United States among the world's nations in developing a "comprehensive, multilateral strategy to bring democracy to and improve human rights practices and the quality of life in Burma." §570(c). Congress called for Presidential cooperation with members of ASEAN and other countries in developing such a strategy, *ibid.,* directed the President to encourage a dialogue between the Government of Burma and the democratic opposition, *ibid.,*[15] and required him to report to the Congress on the progress of his diplomatic efforts, §570(d). As with Con-

---

protection," 481 U. S., at 83, but we also examined whether the state law conflicted with federal law "[i]n implementing its goal," *ibid.* Identity of ends does not end our analysis of preemption. See *Gould,* 475 U. S., at 286.

[15] The record supports the conclusion that Congress considered the development of a multilateral sanctions strategy to be a central objective of the federal Act. See, *e. g.,* 142 Cong. Rec., at 19212 (remarks of Sen. Cohen) ("[T]o be effective, American policy in Burma has to be coordinated with our Asian friends and allies"); *id.,* at 19219 (remarks of Sen. Feinstein) ("Only a multilateral approach is likely to be successful").

gress's explicit delegation to the President of power over economic sanctions, Congress's express command to the President to take the initiative for the United States among the international community invested him with the maximum authority of the National Government, cf. *Youngstown Sheet & Tube Co.*, 343 U. S., at 635, in harmony with the President's own constitutional powers, U. S. Const., Art. II, § 2, cl. 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties" and "shall appoint Ambassadors, other public Ministers and Consuls"); § 3 ("[The President] shall receive Ambassadors and other public Ministers"). This clear mandate and invocation of exclusively national power belies any suggestion that Congress intended the President's effective voice to be obscured by state or local action.

Again, the state Act undermines the President's capacity, in this instance for effective diplomacy. It is not merely that the differences between the state and federal Acts in scope and type of sanctions threaten to complicate discussions; they compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments. We need not get into any general consideration of limits of state action affecting foreign affairs to realize that the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics.[16] When such

---

[16] Such concerns have been raised by the President's representatives in the Executive Branch. See Testimony of Under Secretary of State Eizenstat before the Trade Subcommittee of the House Ways and Means Committee (Oct. 23, 1997) (hereinafter Eizenstat testimony), App. 116 ("[U]nless sanctions measures are well conceived and coordinated, so that the United States is speaking with one voice and consistent with our international obligations, such uncoordinated responses can put the US on the political defensive and shift attention away from the problem to the issue of sanctions themselves"). We have expressed similar concerns in our cases on foreign commerce and foreign relations. See, *e. g., Japan Line,*

exceptions do qualify his capacity to present a coherent position on behalf of the national economy, he is weakened, of course, not only in dealing with the Burmese regime, but in working together with other nations in hopes of reaching common policy and "comprehensive" strategy.[17] Cf. *Dames & Moore*, 453 U. S., at 673–674.

While the threat to the President's power to speak and bargain effectively with other nations seems clear enough, the record is replete with evidence to answer any skeptics. First, in response to the passage of the state Act, a number of this country's allies and trading partners filed formal protests with the National Government, see 181 F. 3d, at 47 (noting protests from Japan, the European Union (EU), and ASEAN), including an official *Note Verbale* from the EU to the Department of State protesting the state Act.[18] EU officials have warned that the state Act "could have a damaging effect on bilateral EU–US relations." Letter of Hugo

---

*Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 449 (1979); *Chy Lung* v. *Freeman*, 92 U. S. 275, 279 (1876); cf. The Federalist No. 80, pp. 535–536 (J. Cooke ed. 1961) (A. Hamilton) ("[T]he peace of the WHOLE ought not to be left at the disposal of a PART. The union will undoubtedly be answerable to foreign powers for the conduct of its members").

[17] The record reflects that sponsors of the federal Act were well aware of this concern and provided flexibility to the President over sanctions for that very reason. See, *e. g.*, 142 Cong. Rec., at 19214 (statement of Sen. Thomas) ("Although I will readily admit that our present relationship with Burma is not especially deep, the imposition of mandatory economic sanctions would certainly downgrade what little relationship we have. Moreover, it would affect our relations with many of our allies in Asia as we try to corral them into following our lead"); *id.*, at 19219 (statement of Sen. Feinstein) ("It is absolutely essential that any pressure we seek to put on the Government of Burma be coordinated with the nations of ASEAN and our European and Asian allies. If we act unilaterally, we are more likely to have the opposite effect—alienating many of these allies, while having no real impact on the ground").

[18] In *amicus* briefs here and in the courts below, the EU has consistently taken the position that the state Act has created "an issue of serious concern in EU–U. S. relations." Brief for European Communities et al. as *Amici Curiae* 6.

Paemen, Ambassador, European Union, Delegation of the European Commission, to William F. Weld, Governor, State of Massachusetts, Jan. 23, 1997, App. 75.

Second, the EU and Japan have gone a step further in lodging formal complaints against the United States in the World Trade Organization (WTO), claiming that the state Act violates certain provisions of the Agreement on Government Procurement,[19] H. R. Doc. No. 103–316, p. 1719 (1994), and the consequence has been to embroil the National Government for some time now in international dispute proceedings under the auspices of the WTO. In their brief before this Court, EU officials point to the WTO dispute as threatening relations with the United States, Brief for European Communities et al. as *Amici Curiae* 7, and n. 7, and note that the state Act has become the topic of "intensive discussions" with officials of the United States at the highest levels, those discussions including exchanges at the twice yearly EU–U. S. Summit.[20]

Third, the Executive has consistently represented that the state Act has complicated its dealings with foreign sovereigns and proven an impediment to accomplishing objectives assigned it by Congress. Assistant Secretary of State Larson, for example, has directly addressed the mandate of the

---

[19] Although the WTO dispute proceedings were suspended at the request of Japan and the EU in light of the District Court's ruling below, Letter of Ole Lundby, Chairman of the Panel, to Ambassadors from the European Union, Japan, and the United States (Feb. 10, 1999), and have since automatically lapsed, Understanding on Rules and Procedures Governing the Settlement of Disputes, 33 International Legal Materials 1125, 1234 (1994), neither of those parties is barred from reinstating WTO procedures to challenge the state Act in the future. In fact, the EU, as *amicus* before us, specifically represents that it intends to begin new WTO proceedings should the current injunction on the law be lifted. Brief for European Communities et al. as *Amici Curiae* 7. We express no opinion on the merits of these proceedings.

[20] Senior Level Group Report to the U. S.–EU Summit in Washington 3 (Dec. 17, 1999), http://www.eurunion.org/partner/summit/Summit9912/SLGRept.html.

federal Burma law in saying that the imposition of unilateral state sanctions under the state Act "complicate[s] efforts to build coalitions with our allies" to promote democracy and human rights in Burma. A. Larson, State and Local Sanctions: Remarks to the Council of State Governments 2 (Dec. 8, 1998). "[T]he EU's opposition to the Massachusetts law has meant that US government high level discussions with EU officials often have focused not on what to do about Burma, but on what to do about the Massachusetts Burma law." *Id.*, at 3.[21] This point has been consistently echoed in the State Department:

"While the [Massachusetts sanctions on Burma] were adopted in pursuit of a noble goal, the restoration of democracy in Burma, these measures also risk shifting the focus of the debate with our European Allies away from the best way to bring pressure against the State Law and Order Restoration Council (SLORC) to a potential WTO dispute over its consistency with our international obligations. Let me be clear. We are working with Massachusetts in the WTO dispute settlement process. But we must be honest in saying that the threatened WTO case risks diverting United States' and Europe's attention from focusing where it should be—on Burma." Eizenstat testimony, App. 115.[22]

---

[21] Assistant Secretary Larson also declared that the state law "has hindered our ability to speak with one voice on the grave human rights situation in Burma, become a significant irritant in our relations with the EU and impeded our efforts to build a strong multilateral coalition on Burma where we, Massachusetts and the EU share a common goal." Assistant Secretary of State Alan P. Larson, State and Local Sanctions: Remarks to the Council of State Governments 3 (Dec. 8, 1998).

[22] The United States, in its brief as *amicus curiae*, continues to advance this position before us. See Brief for United States as *Amicus Curiae* 8–9, and n. 7, 34–35. This conclusion has been consistently presented by senior United States officials. See also Testimony of Deputy Assistant Secretary of State David Marchick before the California State Assembly, Oct. 28, 1997, App. 137; Testimony of Deputy Assistant Secretary of State

This evidence in combination is more than sufficient to show that the state Act stands as an obstacle in addressing the congressional obligation to devise a comprehensive, multilateral strategy.

Our discussion in *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, 512 U. S. 298, 327–329 (1994), of the limited weight of evidence of formal diplomatic protests, risk of foreign retaliation, and statements by the Executive does not undercut the point. In *Barclays*, we had the question of the preemptive effect of federal tax law on state tax law with discriminatory extraterritorial effects. We found the reactions of foreign powers and the opinions of the Executive irrelevant in fathoming congressional intent because Congress had taken specific actions rejecting the positions both of foreign governments, *id.*, at 324–328, and the Executive, *id.*, at 328–329. Here, however, Congress has done nothing to render such evidence beside the point. In consequence, statements of foreign powers necessarily involved in the President's efforts to comply with the federal Act, indications of concrete disputes with those powers, and opinions of senior National Government officials are competent and direct evidence of the frustration of congressional objectives by the state Act.[23] Although we do not unquestioningly defer to the legal judgments expressed in Executive Branch statements when determining a federal Act's preemptive charac-

---

David Marchick before the Maryland House of Delegates Committee on Commerce and Government Matters, Mar. 25, 1998, *id.*, at 166 (same).

[23] We find support for this conclusion in the statements of the congressional sponsors of the federal Act, who indicated their opinion that inflexible unilateral action would be likely to cause difficulties in our relations with our allies and in crafting an effective policy toward Burma. See n. 17, *supra*. Moreover, the facts that the Executive specifically called for flexibility prior to the passage of the federal Act, and that the Congress rejected less flexible alternatives and adopted the current law in response to the Executive's communications, bolster the relevance of the Executive's opinion with regard to its ability to accomplish Congress's goals. See n. 9, *supra*.

ter, *ibid.*, we have never questioned their competence to show the practical difficulty of pursuing a congressional goal requiring multinational agreement. We have, after all, not only recognized the limits of our own capacity to "determin[e] precisely when foreign nations will be offended by particular acts," *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 194 (1983), but consistently acknowledged that the "nuances" of "the foreign policy of the United States . . . are much more the province of the Executive Branch and Congress than of this Court," *id.*, at 196; *Barclays, supra*, at 327. In this case, repeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state Act stands in the way of Congress's diplomatic objectives.[24]

## IV

The State's remaining argument is unavailing. It contends that the failure of Congress to preempt the state Act

_____

[24] The State appears to argue that we should ignore the evidence of the WTO dispute because under the federal law implementing the General Agreement on Tariffs and Trade (GATT), Congress foreclosed suits by private persons and foreign governments challenging a state law on the basis of GATT in federal or state courts, allowing only the National Government to raise such a challenge. See Uruguay Round Agreements Act (URAA), § 102(c)(1), 108 Stat. 4818, 19 U. S. C. §§ 3512(b)(2)(A), 3512(c)(1); see also "Statement of Administrative Action" (SAA), reprinted in H. R. Doc. No. 103–216, pp. 656, 675–677 (1994). To consider such evidence, in its view, would effectively violate the ban by allowing private parties and foreign nations to challenge state procurement laws in domestic courts. But the terms of § 102 of the URAA and of the SAA simply do not support this argument. They refer to challenges to state law based on inconsistency with any of the "Uruguay Round Agreements." The challenge here is based on the federal Burma law. We reject the State's argument that the National Government's decisions to bar such WTO suits and to decline to bring its own suit against the Massachusetts Burma law evince its approval. These actions simply do not speak to the preemptive effect of the federal sanctions against Burma.

demonstrates implicit permission. The State points out that Congress has repeatedly declined to enact express preemption provisions aimed at state and local sanctions, and it calls our attention to the large number of such measures passed against South Africa in the 1980's, which various authorities cited have thought were not preempted.[25] The State stresses that Congress was aware of the state Act in 1996, but did not preempt it explicitly when it adopted its own Burma statute.[26] The State would have us conclude that Congress's continuing failure to enact express preemption implies approval, particularly in light of occasional instances of express preemption of state sanctions in the past.[27]

The argument is unconvincing on more than one level. A failure to provide for preemption expressly may reflect noth-

---

[25] See, *e. g., Board of Trustees* v. *Mayor and City Council of Baltimore,* 317 Md. 72, 79–98, 562 A. 2d 720, 744–749 (1989) (holding local divestment ordinance not preempted by Comprehensive Anti-Apartheid Act of 1986 (CAAA)), cert. denied *sub nom. Lubman* v. *Mayor and City Council of Baltimore,* 493 U. S 1093 (1990); Constitutionality of South African Divestment Statutes Enacted by State and Local Goverments, 10 Op. Off. Legal Counsel 49, 64–66, 1986 WL 213238 (state and local divestment and selective purchasing laws not preempted by pre-CAAA federal law); H. R. Res. Nos. 99–548, 99–549 (1986) (denying preemptive intent of CAAA); 132 Cong. Rec. 23119–23129 (1986) (House debate on resolutions); *id.,* at 23292 (Sen. Kennedy, quoting testimony of Laurence H. Tribe). *Amicus* Members of Congress in support of the State also note that when Congress revoked its federal sanctions in response to the democratic transition in that country, it refused to preempt the state and local measures, merely "urg[ing]" both state and local governments and private boycott participants to rescind their sanctions. Brief for Senator Boxer et al. as *Amici Curiae* 9, citing South African Democratic Transition Support Act of 1993, § 4(c)(1), 107 Stat. 1503.

[26] The State also finds significant the fact that Congress did not preempt state and local sanctions in a recent sanctions reform bill, even though its sponsor seemed to be aware of such measures. See H. R. Rep. No. 105–2708 (1997); 143 Cong. Rec. E2080 (Oct. 23, 1997) (Rep. Hamilton).

[27] See Export Administration Act of 1979, 50 U. S. C. App. § 2407(c) (1988 ed.) (Anti-Arab boycott of Israel provisions expressly "preempt any law, rule, or regulation").

ing more than the settled character of implied preemption doctrine that courts will dependably apply, and in any event, the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict, *Hines*, 312 U. S., at 67. The State's inference of congressional intent is unwarranted here, therefore, simply because the silence of Congress is ambiguous. Since we never ruled on whether state and local sanctions against South Africa in the 1980's were preempted or otherwise invalid, arguable parallels between the two sets of federal and state Acts do not tell us much about the validity of the latter.

## V

Because the state Act's provisions conflict with Congress's specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause.

The judgment of the Court of Appeals for the First Circuit is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

It is perfectly obvious on the face of this statute that Congress, with the concurrence of the President, intended to "provid[e] the President with flexibility in implementing its Burma sanctions policy." *Ante*, at 375, n. 9. I therefore see no point in devoting a footnote to the interesting (albeit unsurprising) proposition that "[s]tatements by the sponsors of the federal Act" show that they shared this intent, *ibid.*, and that a statement in a letter from a State Department officer shows that flexibility had "the explicit support of the

Executive," *ante*, at 375, n. 9. This excursus is especially pointless since the immediately succeeding footnote must rely upon the statute itself (devoid of any support in statements by "sponsors" or the "Executive") to refute the quite telling argument that the statements were addressed only to flexibility in administering the sanctions of the *federal* Act, and said nothing at all about state sanctions. See *ante*, at 376, n. 10.

It is perfectly obvious on the face of the statute that Congress expected the President to use his discretionary authority over sanctions to "move the Burmese regime in the democratic direction," *ante*, at 377. I therefore see no point in devoting a footnote to the interesting (albeit unsurprising) proposition that "[t]he sponsors of the federal Act" shared this expectation, *ante*, at 377, n. 12.

It is perfectly obvious on the face of the statute that Congress's Burma policy was a "calibrated" one, which "limit[ed] economic pressure against the Burmese Government to a specific range," *ante*, at 377. I therefore see no point in devoting a footnote to the interesting (albeit unsurprising) proposition that bills imposing greater sanctions were introduced but not adopted, *ante*, at 378, n. 13, and to the (even less surprising) proposition that the sponsors of the legislation made clear that its "limits were deliberate," *ibid.* And I would feel this way even if I shared the Court's naïve assumption that the failure of a bill to make it out of committee, or to be adopted when reported to the floor, is the same as a congressional "reject[ion]" of what the bill contained, *ibid.* Curiously, the Court later recognizes, in rejecting the argument that Congress's failure to enact express pre-emption implies approval of the state Act, that "the silence of Congress [may be] ambiguous." *Ante*, at 388. Would that the Court had come to this conclusion *before* it relied (several times) upon the implications of Congress's failure to enact legislation, see *ante*, at 376, n. 11, 378, n. 13, 385, n. 23.

It is perfectly obvious on the face of the statute that Congress intended the President to develop a "multilateral strategy" in cooperation with other countries. In fact, the statute says that in so many words, see § 570(c), 110 Stat. 3009–166. I therefore see no point in devoting two footnotes to the interesting (albeit unsurprising) proposition that three Senators *also* favored a multilateral approach, *ante,* at 380, n. 15, 382, n. 17.

It is perfectly obvious from the record, as the Court discusses, *ante,* at 382–385, that the inflexibility produced by the Massachusetts statute has in fact caused difficulties with our allies and has in fact impeded a "multilateral strategy." And as the Court later says in another context, "the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict," *ante,* at 388. I therefore see no point in devoting a footnote to the interesting (albeit unsurprising) fact that the "congressional sponsors" of the Act and "the Executive" actually *predicted* that inflexibility would have the effect of causing difficulties with our allies and impeding a "multilateral strategy," *ante,* at 385, n. 23.

Of course even if all of the Court's invocations of legislative history were not utterly irrelevant, I would still object to them, since neither the statements of individual Members of Congress (ordinarily addressed to a virtually empty floor),* nor Executive statements and letters addressed to congressional committees, nor the nonenactment of other proposed legislation, is a reliable indication of what a majority of both Houses of Congress intended when they voted for the statute before us. The *only* reliable indication of *that* intent—the only thing we know for sure can be attributed

---

*Debate on the bill that became the present Act seems, in this respect, not to have departed from the ordinary. Cf. 142 Cong. Rec. 19263 (1996) (statement of Sen. McConnell) (noting, in debate regarding which amendment to take up next: "I do not see anyone on the Democratic side in the Chamber").

to *all* of them—is the words of the bill that they voted to make law. In a way, using unreliable legislative history to confirm what the statute plainly says anyway (or what the record plainly shows) is less objectionable since, after all, it has absolutely no effect upon the outcome. But in a way, this utter lack of necessity makes it even worse—calling to mind St. Augustine's enormous remorse at stealing pears when he was not even hungry, and just for the devil of it ("not seeking aught through the shame, but the shame itself!"). The Confessions, Book 2, ¶ 9, in 18 Great Books of the Western World 10–11 (1952) (E. Pusey transl. 1952).

In any case, the portion of the Court's opinion that I consider irrelevant is quite extensive, comprising, in total, about one-tenth of the opinion's size and (since it is in footnote type) even more of the opinion's content. I consider that to be not just wasteful (it was not preordained, after all, that this was to be a 25-page essay) but harmful, since it tells future litigants that, even when a statute is clear on its face, and its effects clear upon the record, statements from the legislative history may help (and presumably harm) the case. If so, they must be researched and discussed by counsel— which makes appellate litigation considerably more time consuming, and hence considerably more expensive, than it need be. This to my mind outweighs the arguable good that may come of such persistent irrelevancy, at least when it is indulged in the margins: that it may encourage readers to ignore our footnotes.

For this reason, I join only the judgment of the Court.