ROSENBAUM, Circuit Judge,
concurring in part and dissenting in part:
This is a difficult case, but not because the statutory language we must construe is unclear—in my opinion, it isn’t. No, this case is challenging because despite the clarity of the statutory language, the agency charged with administering the statute has, for nearly the past 50 years—through both Republican and Democrat administrations—consistently construed it in a way that conflicts with what appears to me to be the objectively indisputable meaning of the statutory language. That fact gives me serious pause. And so I have examined and reexamined the statutory language for ambiguity. Despite my best efforts, I am unable to find any. Since the statute is, in my view, susceptible of only a single interpretation, as the Majority points out, we must abide by its plain meaning, without resorting to the administering agency’s construction.
Though I agree with the Majority on the interpretation of the ADEA, I disagree with the Majority on the equitable-tolling *976 issue, for the reasons expressed by both Judges Martin and Jordan. So I dissent from the Majority opinion and join the dissents on that issue.
I.
By any measure, in my view, the statutory language of § 4(a)(2) of the Age Discrimination in Employment Act (“ADEA”) is unambiguous. I do not see how the statutory language itself, the structure of the ADEA, and the historical sequence of amendments and proposed amendments to both the ADEA and Title VII, on which the ADEA was based, leave any other possibility. I write separately to explain why this is so.
A.
The Majority has already explained why the statutory language is clear. I agree with that analysis and add the following.
Section 4(a)(2) makes it “unlawful for an employer ... to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s age.” 29 U.S.C. § 623(a)(2). The term “otherwise” in this statute must mean something. If not, Congress could have left it out, and the statute could have stated simply, “in any way which would deprive or tend to deprive any individual of employment opportunities or adversely affect his status as an employee....” And if that were the case, the phrases “in any way which would deprive or tend to deprive any individual of employment opportunities” and “adversely affect his status as an employee” could be read in the disjunctive, entirely independent of each other, allowing a plaintiff to show that an employer’s actions violated his rights either by “depriving] or tending] to deprive [him] of employment opportunities” or by “adversely affect[ing] his status as an employee.”
But that is not what § 4(a)(2) says. It uses the word “otherwise” to modify the phrase “adversely affect his status as an employee.” And “otherwise” has meaning. “Otherwise” signals that the two phrases in § 4(a)(2) cannot be entirely independent of each other; instead, a relationship between the two phrases exists. In that relationship, each phrase describes a mutually exclusive subset of the universe of actions that “adversely affect ,.. status as an employee.” Together, these two subsets compose the entirety of the universe of actions that “adversely affect ... status as an employee.”
“Otherwise” means “[i]n another way; differently,” Otherwise, The American Heritage Dictionary of the English Language (4th ed. 2000). Because “otherwise” is an adverb that modifies “adversely affect” in this case, “otherwise adversely affect his status as an employee” refers to actions that would “adversely affect ... status as an employee” in any way that is different from the manner in which “depriving] or tending] to deprive any individual of employment opportunities” would “adversely affect ... status as an employee.” So the first phrase—“in any way which would deprive or tend to deprive any individual of employment opportunities”—refers to actions that limit or preclude, for example, promotion opportunities, while the second—“otherwise adversely affect ,.. status as an employee”'—contemplates actions that would, for instance, result in demotions, layoffs, or terminations.
Because of the word “otherwise,” no other construction makes sense to me.
And since the word “otherwise” necessarily means that “depriving] or tending] to deprive any individual of employment *977 opportunities” is a subset of “adversely affect[ing] ... status as an employee,” § 4(a)(2) cannot cover disparate-income hiring claims. “[D]epriv[ing] or tend[ing] to deprive any individual of employment opportunities” by not hiring a person who is not an employee cannot “adversely affect his status as an employee” because he has no “status as an employee.” Instead, his status is and remains that of a non-employee.
Plus, “affect” means “[t]o have an influence on or effect a change in.” Affect, The American Heritage Dictionary of the Em glish Language (4th ed. 2000). But to change something, it must exist in the first place. If a person has no “status as an employee,” “depriv[ing] or tending] to deprive” that person “of employment opportunities” does not change that person’s status as a non-employee; he started as a non-employee, and he remains a non-employee.
And finally, “adversely” means in a manner “[cjontrary to one’s interests or welfare; harmful or unfavorable.” Adverse, The American Heritage Dictionary of the English Language (4th ed. 2000). So unfavorably changing a person’s status as an employee necessarily refers to harming that person’s status as an employee. If a person is not an employee, there is no “status as an employee” that an employer can harm.
So the language of § 4(a)(2) is susceptible of only a single interpretation that makes sense to me—and that interpretation does not provide for coverage of disparate-impact hiring claims.
B.
The Majority also describes how the structure of the ADEA requires the interpretation of § 4(a)(2) as' not providing coverage for disparate-impact hiring claims. I concur in that discussion but wish to further elaborate.
In particular, the Majority compares § 4(a)(2) to § 4(c)(2), noting that the provisions are “largely parallel” except that § 4(c)(2) includes the phrase “or as an applicant for employment” after its use of the term “employee.” To demonstrate why this point is so persuasive, it is helpful to look at both statutes together.
Section 4(a)(2) makes it unlawful for an employer
to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s age.
29 U.S.C. § 623(a)(2) (emphasis added). Section 4(c)(2) makes it unlawful for a labor organization
to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an em- . ployee or as an applicant for employment, because of such individual’s age.
29 U.S.C. § 623(c)(2) (emphasis added). The bolded portions of each statute are exactly the same. As for the regular-style portions of the statutes, though they !are different, they do not differ in a manner that affects the analysis of whether each statute contemplates coverage of applicants for employment.
True, as Judge Martin points out, § 4(c)(2) deals with labor organizations and, in part, their role in employment opportunities, but that fact does not explain why the phrase “or as an applicant for *978 employment” needed to be added in § 4(c)(2) to cover applicants for employment if it did not need to be included in § 4(a)(2) to cover applicants for employment. Nor have I been able to figure out why the fact that § 4(c)(2) deals with labor organizations while § 4(a)(2) deals with employers matters to the analysis of why the phrase “or as an applicant for employment” appears in § 4(c)(2) but not § 4(a)(2).
It seems to me that if the language in § 4(a)(2) covered applicants for employment, the exact same language in § 4(c)(2) would suffice to do the same thing—regardless of the fact that one statute addresses employers and the other, labor organizations. Yet Congress felt the need to add the phrase “or as an applicant for employment” after “or otherwise adversely affect his status as an employee” in § 4(c)(2) to cover applicants. Why would Congress do that if “applieant[s] for employment” were already covered by the language in § 4(a)(2)?
The phrase “applicant [or applicants] for employment” also appears in other places in the ADEA. See, e.g., 29 U.S.C. § 623(d); 29 U.S.C. § 631(b); 29 U.S.C. §§ 633a(a), (b). Clearly, Congress knew how to and did expressly include “applicants for employment” when it wished to do so. But conspicuously absent from § 4(a)(2) is any reference to “applicants for employment.” We must account for this fact in a meaningful way. The only way that makes sense to me is that Congress provided coverage for disparate-impact hiring-related claims under § 4(c)(2) but not under § 4(a)(2).
C.
The historical chronology of events relating to the enactment and amendments of the ADEA and Title VII further demonstrates that § 4(a)(2) does not cover disparate-impact hiring claims.[1]
*979 In 1964, Congress enacted the Civil Rights Act of 1964. The ADEA, which Congress enacted on December 15, 1967, was modeled after the Civil Rights Act of 1964. So § 703(a)(2) of the Civil Rights Act of 1964 and § 4(a)(2) of the ADEA, at the time it was enacted, were exactly the same, except for the groups that each provision protected. Section 703(a)(2) stated,
It shall be an unlawful employment practice for an employer—(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual’s race, color, religion, sex, or national origin.
Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241, 255.
But significantly, in February 1967—ten months, before Congress enacted the ADEA—it considered Senate Bill 1026, which sought to amend § 703(a)(2) of the Civil Rights Act of 1964 to “[a]dd the phrase ‘or applicants for employment’ after the phrase ‘his employees in section 703(a)(2).” 113 Cong. Reo. 3951 (1967). While the amendment did not pass in 1967, Congress considered similar bills proposing the same amendment until it ultimately enacted the Equal Employment Act of 1972 on March 24,1972. That Act amended § 703(a)(2) of Title VII to add the phrase “or applicants for employment” after the phrase “his employees.” See Equal Employment Opportunity Act of 1972, Pub. L. 92-261, 86 Stat. 103,109.
In stark contrast, Congress has never similarly amended the ADEA’s parallel § 4(a)(2). Instead, to this day, unlike § 703(a)(2), § 4(a)(2) continues to lack the phrase “or applicants for employment.” That- Congress had considered amending the very same language in Title VII that appears in §. 4(a)(2) of the ADEA, to add the phrase “or applicants for employment”—even before Congress enacted the ADEA—and that it ultimately did amend that same language in Title VII but did not so amend § 4(a)(2), again strongly, suggests that Congress did not intend to cover disparate-impact hiring claims in § 4(a)(2) of the ADEA.
This historical fact takes on even more significance, in light of amendments to the ADEA that Congress enacted two years after it amended Title VII to include “applicants for employment.” In 1974, Congress amended the ADEA to make it applicable to federal-government employment. See Fair Labor Standards Amendments of 1974, Pub. L. 93-259, 88 Stat. 55, 74.. Notably, Congress expressly made the new provisions (codified at 29 U.S.C. § 633a) applicable to both employees and “applicants for employment.” See, e.g., 29 U.S.C. § 633a(a). Yet while Congress amended the ADEA, in part to add coverage for “applicants for employment” in federal-government employment, it made no amendment to § 4(a)(2) to add “applicants for employment,” despite hav *980 ing amended the parallel language of § 703(a)(2) of Title VII to add “applicants for employment” just two years earlier.
So to recap, the “applicants for employment” issue was on Congress’s radar screen at the time that it enacted the ADEA without that language in § 4(a)(2); at the time that it amended the parallel provision of Title VII, after the ADEA had already been enacted; and at the time that Congress amended the ADEA itself, in part to provide coverage to “applicants for employment” in federal-government employment. At any one of these times, Congress easily could have chosen to add the “applicants for employment” language to § 4(a)(2) df the ADEA. It did not. We can’t ignore that fact.
Nor does Smith v. City of Jackson, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), suggest that we can. Significantly, the Smith plurality “agree[d] that the differences between age and the classes protected in Title VII are relevant, and that Congress might well have intended to treat the two differently.” Id. at 236 n.7, 125 S.Ct. 1536 (plurality opinion). The plurality then cautioned that differences between the texts of Title VII and the ADEA are important, noting that differences between age and the classes protected in Title VII, “coupled with a difference in the text of the statute ..., may warrant addressing disparate-impact claims in the two statutes differently.”[2] Id. (emphasis in original). That is precisely what we have when we compare the texts of § 4(a)(2) of the ADEA and § 703(a)(2) of Title VII. Indeed, though the plurality did not consider whether § 4(a)(2) of the ADEA covers disparate-impact hiring claims, the plurality nonetheless recognized that “the scope of disparate-impact liability under ADEA is narrower than under Title VII.” Id. at 240, 125 S.Ct. 1536 (plurality opinion).
For these reasons, I cannot find the ambiguity in § 4(a)(2) that my dissenting colleagues describe, so I concur in the Majority’s decision holding that § 4(a)(2) does not provide coverage for disparate-impact hiring claims.
Nevertheless, as the Majority notes, see Maj. Op. at 970, that fact does not render disparate-impact evidence irrelevant or inadmissible in disparate-treatment cases under the ADEA. To the contrary, disparate-impact evidence can play an important role in proving a disparate-treatment claim, and nothing we have said here today suggests otherwise.
II.
Because the language of § 4(a)(2), the statutory structure of the ADEA, and the history of amendments to thé ADEA and Title VII all lead to only one viable interpretation of the meaning of § 4(a)(2), I concur in the Majority’s decision to the extent that it holds that no cause of action *981 for disparate impact hiring exists under the ADEA.
But I dissent from the Majority’s decision on the equitable-tolling issue and join the dissents of my colleagues.

. Judge Martin suggests that we should not consider the legislative sequence of events. See Martin Dissent at n.5. In support of this position, she relies on Crosby v. National Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), as an example of a case where the Supreme Court "refused to conclude that Congress ‘repeatedly declining] to enact express preemption provisions' implied anything 'simply because the silence of Congress is ambiguous.’" Id. at 386-88, 120 S.Ct. at 2301-02. The circumstances at issue in Crosby, however, are readily distinguishable from those in this case, and I respectfully disagree that Crosby provides any support for the notion that the legislative sequence of amendments in this case is irrelevant. In Crosby, Massachusetts enacted a statute barring state entities from buying goods or services from companies doing business with Burma. Three months later, Congress passed a law imposing mandatory and conditional sanctions on Burma. The Supreme Court found Massachusetts's law to be preempted by federal law because it stood as an obstacle to the accomplishment and execution of the purposes and objectives of Congress. Id. at 372-73, 120 S.Ct. 2288. In doing so, the Court rejected Massachusetts's argument that Congress's failure to preempt the state act demonstrated "implicit permission.” Id. at 387-88, 120 S.Ct. 2288. In reaching this conclusion, the Court explained the unique nature of preemption:
A failure to provide for preemption expressly may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply, and in any event, the existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict.... The State’s inference of congressional intent is unwarranted here, therefore, simply because the silence of Congress is ambiguous.
Id. (citation omitted) (emphasis added). In other words, the mere fact that Congress did not expressly preempt state action in the original statute or amend the statute later to preempt state action did not mean that Congress intended to authorize state action because Congress can impliedly preempt state action. Of course, Villarreal’s case does not involve preemption, so for that reason alone, *979 Crosby is . not instructive. But, in any case, I do not suggest considering Congress's failure to amend § 4(a)(2) of the ADEA by adding the words "applicants for employment,” in a vacuum, like the state did in Crosby. Instead, my point is that a comparison of the amendment made to § 703(a)(2) of Title VII—the statute on which the ADEA was based—to the failure to make the same or similar amendment to the exact same language in § 4(a)(2) of the ADEA, all within the same general time frame as Congress otherwise amended the ADEA to add the same phrase that it added to § 703(a)(2) of Title yil—"applicants for employment”—is meaningful. This sequence of events indicates that Congress understood a difference between including the language "applicants for employment” and not doing so, and it acted deliberately in choosing to add that language to Title VII’s counterpart to the ADEA’s § 4(a)(2) and to other sections of the ADEA but not to § 4(a)(2).

. While, as Judge Martin points out in footnote 8 of her dissent, § 4(f)(1) of the ADEA was the provision under consideration in Smith, the Supreme Court did not limit its ■pronouncement that differences between age and the classes protected in Title VII, "coupled with a difference in the text of the statute .. may warrant addressing disparate-impact claims in the two statutes differently,” as pertaining solely to differences between Title VII and § 4(f)(1) of the ADEA. Smith, 544 U.S, at 236 n.7, 125 S.Ct. 1536 (plurality opinion). Instead, the Supreme Court broadly phrased its statement as a rule to be followed in the analysis of all disparate-impact claims under the ADEA and Title VII. It just so happened in Smith, though, that the Supreme Court was considering only whether § 4(a)(2) of the ADEA provides for a disparate-impact claim of any type to anyone. It was not looking at the issue of whether § 4(a)(2) provides for a disparate-impact claim in the context of hiring decisions.