In re: ASSICURAZIONI GENERALI
S.P.A. HOLOCAUST INSURANCE
LITIGATION

This Disposition Applies to All Actions.

No. MDL 1374.
No. M21–89MBM.

United States District Court,
S.D. New York.

Oct. 14, 2004.

Robert A. Swift, Joanne Zack, Kohn, Swift & Graf, P.C., Philadelphia, PA, for Cornell and Smetana Plaintiffs.

Edward D. Fagan, the Law Offices of Edward D. Fagan, Livingston, NJ, for Cornell and Smetana Plaintiffs.

Lawrence Kill, Linda Gerstel, Anderson Kill & Olick, P.C., New York City, for Cornell and Smetana Plaintiffs.

William Marks, the Marks Law Firm, Bernardsville, NJ, for Cornell Plaintiffs.

Carey R. D'Avino, Carey R. D'Avino, P.C., New York City, for Cornell Plaintiffs.

Michael Witti, Witti, Neumann & Partners, 81679 Monchen (Bogenhausen), Germany, for Cornell Plaintiffs.

Nancy Sher Cohen, Reynold L. Siemens, Stephen N. Goldberg, Heller Ehrman White & McAuliffe, LLP, Los Angeles, CA, for Smetana Plaintiffs.

David A. Lash, Bet Tzedek Legal Services, Inc., Los Angeles, CA, for Smetana Plaintiffs.

Elizabeth J. Cabraser, Morris A. Ratner, Caryn Becker, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, for Schenker Plaintiffs.

Melvyn I. Weiss, Deborah M. Sturman, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for Schenker Plaintiffs.

Martin Mendelsohn, Washington, DC, for Schenker Plaintiffs.

Michael D. Hausfeld, Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for Schenker Plaintiffs.

Arthur Miller, Cambridge, MA, for Schenker Plaintiffs.

Irwin Levin, Richard Shevitz, Cohen & Malad, P.C., Indianapolis, IN, for Schenker Plaintiffs.

Barry A. Fisher, Fleishman, Fisher, Moest, Los Angeles, CA, for Schenker Plaintiffs.

Burt Neuborne, New York University School of Law, New York City, for Schenker Plaintiffs.

Joseph D. Ament, Michael B. Hyman, Much Schelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, IL, for Schenker Plaintiffs.

Thomas R. Fahl, Niebler & Muren, S.C., Brookfield, WI, for Plaintiff David.

William M. Shernoff, Jeffrey Issac Ehrlich, Michael J. Bidart, Ricardo Echeverria, Douglas M. Carasso, Evangeline F. Garris, Shernoff, Bidart, Darras & Dillon, Claremont, CA, for Brauns, Mandil, Szekeres, Lightner, Sladek, and Haberfeld Plaintiffs, and Plaintiffs Lantos, More, Pioro, Sorter, Ungar, Friedman, and Zada.

Lisa Stern, the Law Office of Lisa Stern, Los Angeles, CA, for Brauns, Mandil, Szekeres, Lightner, Sladek, and Haberfeld Plaintiffs, and Plaintiffs Lantos, More, Pioro, Sorter, Ungar, Friedman, and Zada.

Harvey Levine, Levine, Steinberg, Miller & Huver, San Diego, CA, for Plaintiff Mandil.

Patricia L. Glaser, Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, Los Angeles, CA, for Plaintiff Brauns.

Joseph P. Garland, Edward J. Klein, Jay Solomon, Klein & Solomon, LLP, New York City, for Plaintiff Tabaksman.

Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ, for Plaintiff Tabaksman.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Weiss Plaintiffs.

Herbert L. Fenster, Robert L. Carter, Jr., Christina M. Carroll, McKenna & Cuneo, L.L.P., Washington, DC, for Anderman Plaintiffs.

Joseph F. Butler, McKenna & Cuneo, L.L.P., Los Angeles, CA, for Anderman Plaintiffs.

Franklin B. Velie, Dierdre A. Bergman, Salans Hertzfeld Heilbronn Christy & Viener, New York City, for Defendant Assicurazioni Generali S.p.A.

Peter Simshauser, Lance A. Etcheverry, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, CA, for Defendant Assicurazioni Generali S.p.A.

Marco E. Schnabl, William J. Hine, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendant Assicurazioni Generali S.p.A.

M. Scott Vayer, Law Offices of M. Scott Vayer, New York City, for Defendant Assicurazioni Generali S.p.A.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs in twenty separate actions have sued Assicurazioni Generali S.p.A. ("Generali"), an Italian insurer that wrote insurance policies in Europe in the years before and during World War II.[1] The

---

1. Of the twenty actions, two were filed initially in this court: *Cornell v. Assicurazioni Generali S.p.A.*, 97 Civ. 2262 (class action); and *Schenker v. Assicurazioni Generali S.p.A.* (formerly *Winters v. Assicurazioni Generali* ), 98 Civ. 9186 (class action). Sixteen were transferred to this court by the Panel on Multidistrict Litigation ("MDL Panel") under Docket No. 1374: *Brauns v. Assicurazioni Generali S.p.A.*, 00 Civ. 9412; *Smetana v. Assicurazioni Generali S.p.A.*, 00 Civ. 9413 (class action);

*Mandil v. Assicurazioni Generali S.p.A.*, 00 Civ. 9414; *Weiss v. Assicurazioni Generali S.p.A.*, 00 Civ. 9415; *David v. Assicurazioni Generali S.p.A.*, 00 Civ. 9416; *Szekeres v. Assicurazioni Generali S.p.A.*, 01 Civ. 0158; *Lightner v. Assicurazioni Generali S.p.A.*, 01 Civ. 0160; *Sladek v. Assicurazioni Generali S.p.A.*, 01 Civ. 6193; *Haberfeld v. Assicurazioni Generali S.p.A.*, 01 Civ. 9498 (class action); *Lantos v. Assicurazioni Generali S.p.A.*, 03 Civ. 6356; *More v. Assicurazioni Generali S.p.A.*, 03 Civ. 6358; *Pioro v. Assicurazioni Generali*

gravamen of the actions is that Generali failed to pay benefits following the death of the policy holders or damage to their property during the German campaign of genocide known as the Holocaust. Plaintiffs, assertedly the policy beneficiaries or their surviving family members, have advanced numerous claims seeking damages for Generali's non-payment of benefits, as well as ancillary claims predicated on other alleged misconduct. The claims arise under the statutes and common law of New York, Wisconsin, Florida, and California, as well as customary international law.[2] A list of the claims is set forth in the Appendix at the end of this opinion.

Generali previously moved to dismiss on grounds of *forum non conveniens* and contractual forum selection. In connection with that motion, Generali argued, *inter alia,* that the balance of conveniences required dismissal of the actions in favor of the International Commission on Holocaust Era Insurance Claims ("ICHEIC"), a private commission established by several European insurance companies (including Generali), certain nongovernmental Jewish organizations, the State of Israel, and domestic state insurance regulators, to resolve unpaid Holocaust-era insurance claims. I denied Generali's motion by opinion and order dated September 25, 2002, finding, with respect to the application to dismiss the actions in favor of ICHEIC, that that body is an inadequate alternative forum for litigation of plaintiffs' claims. *See In re Assicurazioni Generali S.p.A. Holocaust Insurance Litig.,* 228 F.Supp.2d · 348, 355–58 (S.D.N.Y.2002) (hereinafter, "*Generali I*"). Familiarity with *Generali I* is assumed for present purposes.[3]

With the court's permission, Generali now moves to dismiss or strike, and/or for judgment, on various additional grounds. In light of the Supreme Court's decision in *American Insurance Association v. Garamendi,* 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003), it appears that the laws supporting litigation of plaintiffs' benefits claims are preempted by a federal Executive Branch policy favoring voluntary resolution of Holocaust-era insurance claims through ICHEIC. Plaintiffs' ancillary claims, in turn, are not actionable because it appears that they do not allege any cognizable injury other than that caused by Generali's non-payment of benefits, redress for which is committed to ICHEIC. Accordingly, Generali's motion to dismiss is granted with respect to all actions.

---

S.p.A., 03 Civ. 6359; *Sorter v. Assicurazioni Generali S.p.A.,* 03 Civ. 636; *Ungar v. Assicurazioni Generali S.p.A.,* 03 Civ. 6193; *Weiss/Friedman v. Assicurazioni Generali S.p.A.,* 03 Civ. 6360; and *Zada v. Assicurazioni Generali S.p.A.,* 03 Civ. 6355. *Anderman v. Federal Republic of Austria,* 02 Cv. 8379 (class action), was transferred by the MDL Panel to this court under Docket No. 1337. *Tabaksman v. Assicurazioni Generali S.p.A.,* 01 Civ. 7826, was removed to this court from New York State Supreme Court.

2. Plaintiffs in the *Cornell, Schenker,* and *Tabaksman* actions allege also violations of "international treaties" (*Cornell* Compl. ¶¶ 49–51; *Schenker* Compl. ¶¶ 64–66; Tabaksman Compl. ¶¶ 39–41), but fail to identify in their respective complaints the treaties upon which the alleged violations are premised. Nor do their motion papers address independent violations of international treaties. Accordingly, plaintiffs' claims premised on Generali's violations of international treaties are deemed abandoned.

3. The MDL Panel transferred the *Lantos, More, Pioro, Sorter, Ungar, Weiss/Friedman,* and *Zada* actions, and the portion of *Anderman* alleging claims against Generali, to this court after *Generali I* was issued (*see* Docket Nos. 52, 100), and thus those actions are not referenced in my earlier opinion. Claims against other defendants in *Anderman* were transferred to the Central District of California and subsequently dismissed by that Court. *See Anderman v. Federal Republic of Austria,* 256 F.Supp.2d 1098, 1116 (C.D.Cal.2003).

## I.

### A. *Facts in* Garamendi

At issue in *Garamendi* was the constitutionality of a California statute, the Holocaust Victim Insurance Relief Act of 1999 ("HVIRA"), which imposed disclosure requirements on all insurers operating in that state that sold insurance policies to persons in Europe between 1920 and 1945. 123 S.Ct. at 2383–84 (citing Cal. Ins.Code Ann. § 13804(a) (West Cum.Supp.2003)). HVIRA required each such insurer to report to the California insurance commissioner how many policies it had issued during the relevant period, the current status of each policy, and the names of the beneficiaries, and directed the insurance commissioner to place the information in a central public registry. *Id.* (citing Cal. Ins.Code Ann. §§ 13803, 13804(a)). The mandatory penalty for default was suspension of the insurer's license to do business in the State. *Id.* (citing Cal. Ins.Code Ann. § 13806).

The *Garamendi* plaintiffs, an insurance industry trade association and several insurance companies, sued to enjoin enforcement of HVIRA, arguing, *inter alia,* that the statute interfered with the foreign policy of the United States, implemented by the Executive Branch, as expressed principally although not exclusively in certain executive agreements between the President and the leaders of Germany, France, and Austria. *Id.* at 2386. These agreements were the result of efforts at the national level to achieve a mediated settlement of numerous Holocaust-related lawsuits filed in this country's courts against companies doing business in Germany during the Nazi era. *Id.* at 2381.

The Court's discussion of the executive agreements focused primarily on the agreement with Germany, the Agreement Concerning the Foundation "Remembrance, Responsibility and the Future" (the "German Foundation Agreement").

Pursuant to that agreement, the German government and German companies undertook to contribute 10 billion deutschmarks to the German Foundation, a fund used to compensate persons "who suffered at the hands of German companies during the National Socialist era." *Id.* at 2381 (quoting German Foundation Agreement, July 17, 2000, U.S.-F.R.G., 39 Int'l Legal Materials ("I.L.M.") 1298, 1298 (2000)). In exchange, the United States government (the "Government") agreed to file in all cases involving Holocaust-era claims against German companies a statement of interest expressing the view that "it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II." *Id.* at 2382 (quoting German Foundation Agreement, 39 I.L.M. at 1303). Although the Government declined to guarantee that its foreign policy interests would "in themselves provide an independent legal basis for dismissal," it agreed to tell courts "that U.S. policy interests favor dismissal on any valid legal ground." *Id.* (quoting German Foundation Agreement, 39 I.L.M. at 1304). The Government pledged also to use its "best efforts, in a manner it considers appropriate," to persuade state and local governments to respect the German Foundation as the exclusive mechanism for resolving Holocaust-era claims against German companies. *Id.* (quoting German Foundation Agreement, 39 I.L.M. at 1300, 1303–04).

As to insurance claims specifically, the United States and Germany "agreed that the German Foundation would work with the [ICHEIC]," and Germany stipulated that such claims would be processed in accordance with procedures negotiated with ICHEIC. *Id.* at 2382. In a supplemental agreement, the German Founda-

tion agreed to set aside funds for claims against German insurers approved by ICHEIC, to contribute additional sums to a humanitarian fund administered by ICHEIC, and to work with German insurers that had joined ICHEIC to publish lists of holders of insurance policies issued by German companies who may have been Holocaust victims. *Id.* at 2383 (citations omitted).

The German Foundation Agreement served as the model for similar agreements with France and Austria, although the agreement with France did not address separately the matter of insurance claims. *Id.* at 2383 n. 3.[4]

### B. *The Court's Ruling*

The Court ruled that HVIRA was preempted by an Executive Branch policy favoring voluntary resolution of Holocaust-era insurance claims through ICHEIC.

In reaching this conclusion, the Court began by describing the federal government's supremacy over the States in conducting the Nation's foreign policy and, within the federal government, the President's predominant role in formulating that policy. *Id.* at 2386 ("There is … no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy.… Nor is there any question generally that there is executive authority to decide what that policy should be."). Consistent with this allocation of power in the realm of foreign affairs, the Court had upheld in previous cases the President's authority to make executive agreements with other coun-

tries that settled individual claims filed against foreign governments.

Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice.… Given the fact that the practice goes back over 200 years to the first Presidential administration, and has received congressional acquiescence throughout its history, the conclusion "[t]hat the President's control of foreign relations includes the settlement of claims is indisputable."

*Id.* at 2387 (quoting *United States v. Pink,* 315 U.S. 203, 240, 62 S.Ct. 552, 86 L.Ed. 796 (1942)) (Frankfurter, J., concurring) (additional citations omitted). The Court reasoned that this executive power to settle claims against foreign governments extends also to claims brought against foreign companies because drawing "a sharp line between public and private acts … in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies." *Id.* The Court thus concluded that "[g]enerally, valid executive agreements are fit to preempt state law, just as treaties are.…" *Id.* at 2387–88 (citing *United States v. Belmont,* 301 U.S. 324, 327, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Pink,* 315 U.S. at 223, 62 S.Ct. 552).

The Court next observed that resolving Holocaust-era insurance claims is a matter "well within the Executive's responsibility," inasmuch as the claims implicated the Nation's foreign affairs. *Id.* at 2390.

Since claims remaining in the aftermath of hostilities may be "sources of friction"

---

4. The executive agreements with Austria and France are: the Agreement between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation"; the Agreement Relating to the Agreement of October 24, 2000,

Concerning the Austrian Fund "Reconciliation, Peace and Cooperation"; and the Agreement Between the Government of the United States of America and the Government of France Concerning Payments for Certain Losses Suffering During World War II. *See Garamendi,* 123 S.Ct. at 2383 n. 3.

acting as an "impediment to resumption of friendly relations between the countries involved," . . . there is a longstanding practice of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries. . . . The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state interests are overriding, and which the National Government has addressed. *Id.* (citations omitted).

Turning to the constitutionality of HVIRA, the Court held that the statute was preempted by an executive policy reflected in the executive agreements with Germany, Austria and France, and in various statements by Executive Branch officials. With respect to Holocaust claims generally, the Court found in the "negotiations toward the three settlement agreements," a "consistent Presidential foreign policy" of "encourag[ing] European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions." *Id.* at 2390, 123 S.Ct. 2374. With respect to insurance claims specifically, the Court found that "the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with ICHEIC to develop acceptable claim procedures, including procedures governing disclosures of policy information." *Id.* (citing provision in German Foundation

Agreement declaring German Foundation to be "exclusive forum" for demands against German companies and agreeing to have insurance claims resolved through procedures negotiated with ICHEIC; and same in agreement with Austria). The Court observed further that "this position, of which the agreements are exemplars, has also been consistently supported in the high levels of the Executive Branch," and cited statements by Deputy Treasury Secretary Stuart Eizenstat, the Government's principal representative on Holocaust issues in the Clinton administration, and Ambassador Randolph Bell, Special Envoy for Holocaust issues in the Bush administration, to the effect that ICHEIC is the only effective means of processing unpaid Holocaust-era insurance claims quickly and completely and thus should be considered the "exclusive remedy" for resolving such claims. *Id.* at 2390–91. Here, the Court explicitly rejected the view, expressed by the dissent, that Executive Branch statements by sub-Cabinet level officials are insufficient as a basis for determining the Executive Branch's position. *See id.* at 2391 n. 13 (noting that "[t]here is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is no apparent reason for adopting [a] 'nondelegation' rule to apply within the Executive Branch").

In contrast to the executive policy favoring voluntary settlement of Holocaust-era claims through ICHEIC, the Court found that the California legislature, in enacting HVIRA, "ha[d] taken a different tack of providing regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail." *Id.* at 2391. By reducing the President's economic and diplomatic leverage, HVIRA's disclosure requirement " 'compromise[d] the very capacity of the President to speak

for the Nation with one voice in dealing with other governments' to resolve claims against European companies arising out of World War II." *Id.* at 2391–92 (quoting *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)). Although HVIRA and the Executive Branch shared the goal "of obtaining compensation for Holocaust victims," the statute was "an obstacle to the success of the National Government's chosen 'calibration of force' in dealing with the Europeans using a voluntary approach." *Id.* at 2392 (quoting *Crosby,* 530 U.S. at 380, 120 S.Ct. 2288). The Court concluded:

> The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves. We have heard powerful arguments that the iron fist would work better, and it may be that if the matter of compensation were considered in isolation from all other issues involving the European allies, the iron fist would be the preferable policy. But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict, and the evidence here is "more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives."

*Id.* at 2393 (quoting *Crosby,* 530 U.S. at 386, 120 S.Ct. 2288) (alteration in *Garamendi* ).

## II.

The Supreme Court's decision in *Garamendi* compels dismissal of plaintiffs' claims seeking damages for Generali's non-payment of policy benefits. The dispositive force of the ruling is most evident in relation to plaintiffs' benefits claims arising under state Holocaust statutes, like HVIRA, designed to foster litigation of Holocaust-era insurance claims. *Cf.* Tex. Atty. Gen. Op. GA–0116, 2003 WL 22451383, at *6 (Oct. 20, 2003) (concluding on basis of *Garamendi* that Texas statute featuring "virtually identical provisions" to HVIRA "interferes with the President's conduct of foreign affairs, and is thus preempted by the United States Constitution").[5] However, the Court's decision requires dismissal also of the benefits claims arising under generally applicable state statutes and common law as well as customary international law. Litigation of Holocaust-era insurance claims, no matter the particular source of law under which the claims arise, necessarily conflicts with the executive policy favoring voluntary resolution of such claims through ICHEIC. The salient fact for present purposes is that plaintiffs seek to obtain redress for Generali's non-payment of policy benefits by filing lawsuits in this country's courts; the legal justification for such claims is irrelevant. *Cf. Boyle v. United Technologies Corp.,* 487 U.S. 500, 508, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (noting that in some cases where uniquely federal interest displaces state law, "the entire body of state law applicable to the area conflicts and is replaced by federal rules") (citing

---

**5.** Plaintiffs assert claims under HVIRA (*Anderman* Compl. ¶¶ 462–74) and Florida's Holocaust Victims Insurance Act, Fla. Stat. § 626.9543 (Cum.Supp.2003) (*Weiss* Compl. ¶¶ 123–34). In addition, plaintiffs in the *Cornell* and *Schenker* actions borrow from certain provisions in New York's Holocaust Victims Insurance Act of 1998, N.Y. Ins. Law §§ 2701–11 (Consol.2000), in alleging unfair business practices. (*Cornell* Compl. ¶¶ 83–84; *Schenker* Compl. ¶¶ 102–03); In *Garamendi,* the Court listed the New York and Florida statutes, among others not implicated in this litigation, as being "similar to HVIRA." 123 S.Ct. at 2385 n. 6.

*Clearfield Trust v. United States,* 318 U.S. 363, 366–67, 318 U.S. 744, 63 S.Ct. 573, 87 L.Ed. 838 (1943)). In short, following *Garamendi,* it appears that plaintiffs cannot use the courts to obtain recovery of benefits due under Holocaust-era policies, regardless of the theory of recovery.

■ There is little question that an executive policy can have such broad preemptive effect over the laws on which plaintiffs' benefits claims are based. As discussed above, the Court observed in *Garamendi* that resolving Holocaust-era insurance claims is a matter "well within the Executive's responsibility for foreign affairs," and that that responsibility includes the power to settle claims against foreign companies pending in this country's courts. 123 S.Ct. at 2387, 2390. More generally, the Supreme Court has endorsed repeatedly, including in *Garamendi,* the notion of executive primacy in the sphere of foreign affairs. *See, e.g., Garamendi,* 123 S.Ct. at 2386 (noting that "the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations' ") (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring)); *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs"); *Dep't of the Navy v. Egan,* 484 U.S. at 518, 529 (1988) (noting "the generally accepted view that foreign policy [is] the province and responsibility of the Executive") (quoting *Haig v. Agee,* 453 U.S. 280, 293–94, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981)); *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("The President ... possesses in his own right certain powers conferred by the Constitution on him as Command-er–in–Chief and as the Nation's organ in foreign affairs...."); *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (1936) (referring to "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress").

■ Certain plaintiffs argue that giving such broad preemptive effect to the executive policy favoring ICHEIC resolution is improper because "the wholesale destruction of [their] claims implicates constitutionally protected due process, property, and contract rights." (Surreply of Plaintiffs Lantos, More, Pioro, Sorter, Ungar, Weiss–Friedman, and Zada (hereinafter, "Surreply of Plaintiffs Lantos et al."), at 7– 8) They point to a footnote in *Garamendi* stating that executive preemption of state law is "subject ... to the Constitution's guarantees of individual rights." (*Id.* at 7 (quoting *Garamendi,* 123 S.Ct. at 2387 n. 9)). To be sure, it is a "well-established" principle in preemption doctrine that " 'no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.' " *Boos v. Barry,* 485 U.S. 312, 324, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (quoting *Reid v. Covert,* 354 U.S. 1, 16, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957)). However, to assert this general principle, without more, is merely to raise the question of whether executive preemption of state laws on which plaintiffs rely causes constitutional harm; it does not settle that inquiry in plaintiffs' favor. In view of the President's settled authority to extinguish legal claims that have a bearing on the Nation's foreign relations, discussed above, plaintiffs' objection fails. Thus, whatever the 'individual rights' limitations on executive preemption

intended by the *Garamendi* footnote, no such rights are implicated in holding that the state laws under which plaintiffs' benefits claims arise are preempted by the executive policy favoring ICHEIC resolution.[6]

■ Nor is there any serious doubt that the executive policy favoring ICHEIC resolution of Holocaust-era insurance claims extends to claims against Generali in particular. The *Garamendi* opinion refers generally to "European insurers" in describing the policy at issue, *see* 123 S.Ct. at 2390 ("As for insurance claims in particular, the national position ... has been to encourage European insurers to work with the ICHEIC to develop acceptable claim procedures ...."), and nowhere distinguishes between Generali and other European insurers that wrote Holocaust-era policies. This is significant because Generali was one of the petitioners in *Garamendi* and the respondent, the California insurance commissioner, referred to Generali repeatedly in its briefs and at oral argument. (*See* excerpts from Respondent's Briefs and Transcript of Oral Argument, Generali's Response to Plaintiffs' Surreply Memoranda Ex. 3, *passim*) Moreover, Generali arguably is the most prominent insurance company defendant in Holocaust-era lawsuits filed in U.S. courts. *See* Michael Bazyler, Trading with the Enemy: Holocaust Restitution, the United States Government, and American Indus-

try, 28 Brooklyn J. Int'l Law 683, 705 (2003) (describing Generali as "[t]he European insurance company with the most notoriety in the field of Holocaust-era restitution"); Michael Bazyler, Nuremberg in America: Litigating the Holocaust in United States Courts, 34 U. Rich. L.Rev. 1, 97 n. 388 (2000) ("Because Generali was the largest seller of insurance to Jews prior to World War II, it is listed as either the lead or only defendant in most of the Holocaust-era insurance lawsuits filed in the United States. It has now become well-known in the arena of human rights litigation and among the American Jewish community."). In view of Generali's involvement in *Garamendi* and its significant role in Holocaust-era litigation generally, the lack of any articulated "Generali exception" in the Court's opinion strongly suggests that the executive policy favoring ICHEIC resolution applies equally to Generali and other European insurers that wrote Holocaust-era policies.

Additional support for the conclusion that the executive policy encompasses claims against Generali may be found in Executive Branch statements promoting ICHEIC resolution as the exclusive remedy for all Holocaust-era insurance claims. For example, in a November 2000 letter from Deputy Secretary Eizenstat to ICHEIC Chairman Eagleburger, the Deputy Secretary acknowledged Generali's

---

**6.** Nothing here forecloses the possibility that enforcement of the executive policy favoring ICHEIC resolution causes a taking of property without just compensation, thus violating the Fifth Amendment of the United States Constitution. Plaintiffs may decide at the appropriate time to bring a "taking" action in the Court of Federal Claims. *See Dames & Moore v. Regan*, 453 U.S. 654, 688–89, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (where President suspended plaintiffs' claims against Iran in favor of claims tribunal, holding that parties whose valid claims were not adjudicated or not fully paid may bring a "taking"

claim against United States in the Court of Claims). *Cf. McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 590 (9th Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984) (declining to hold that Claims Settlement Agreement with Iran was invalid because it took appellants' property rights, on ground that "the availability of redress in the Claims Court satisfies the constitutional requirement of an adequate provision for compensation") (citing *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 122–36, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)).

agreement to make a contribution to ICHEIC for payment of Holocaust-era insurance claims and "commend[ed] the ICHEIC's untiring efforts to provide a measure of justice to Holocaust survivors and their heirs." (Nov. 28, 2000 Eizenstat Ltr., Generali's Response to Plaintiffs' Surreply Memoranda Ex. 1) In the same letter, the Deputy Secretary observed:

> The U.S. government has supported ICHEIC since its inception in 1998 and believes it should be recognized as the exclusive remedy for resolving all insurance claims that relate to the Nazi era. ICHEIC helps further the United States' interest in maintaining good relations with Israel and with Western, Central and Eastern European nations from which many of the [sic] those who suffered during the Nazi era and World War II come.

(*Id.*) This letter, expressing no hint of a distinction between Generali and other European insurers, suggests that claims against Generali are within the scope of the executive policy.

This conclusion is buttressed by other unequivocal pronouncements of the executive policy cited in the *Garamendi* opinion, *see* 123 S.Ct. at 2390–91 (citing, *inter alia,* Hearing before the Committee on House Banking and Financial Services, 106th Cong., 2d Sess., 173 (2000) (Eizenstat statement that "[t]he U.S. Government has supported [the ICHEIC] since it began, and we believe it should be considered the exclusive remedy for resolving insurance claims from the World War II era"); Hearings on H.R. 2693 before the Subcommittee of Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 24 (2002) (Bell statement to the same effect); Hearing on the Legacies of the Holocaust before the Senate Committee on Foreign Relations, 106th Cong., 2d Sess., 23 (2000) (Eizenstat testimony that a company's participation in ICHEIC should give it " 'safe haven' from sanctions, subpoenas, and hearing relative to the Holocaust period"),[7] as well as numerous submissions to this court. (*See, e.g.,* Sept. 16, 2003 Hearing before the House Committee on Govt. Reform, Generali's Response to Plaintiffs' Surreply Memoranda Ex. 2, at 3 (Bell testimony that "ICHEIC process enjoys today the full support of survivors' groups, of major Jewish–American NGOs, and of the Government of Israel, as well as of the Administration")); Nov. 13, 2001 Ltr. from James Bindenagel, Department of State Special Envoy for Holocaust Issues, to William Shernoff, Surreply of Plaintiffs Lantos et al., Ex. B, at 1 ("As a matter of policy, the United States Government believes that the resolution of Nazi-era restitution and compensation matters, including those related to insurance, should be handled through dialogue, negotiation, and cooperation, rather than subject victims and their families to the prolonged uncertainty and delay that accompany litigation. Our longstanding policy of support for ICHEIC is based on U.S. interests in obtaining a measure of justice for victims, while preserving and protecting our political and economic relations with our European friends and allies and the State of Israel."); Jun. 18, 2001 Ltr. from Deputy Secretary Richard Armitage to Eagleburger, Simshauser Decl. in Support of Generali's Motion to Dismiss, filed in *Anderman* action, Ex. 2 ("I am pleased to affirm that the United States government continues to support the ICHEIC and believes it should be viewed as the exclusive remedy for unresolved insurance claims from the National Socialist era and World War II.... ICHEIC helps further U.S. interests by fostering good relations with and

---

7. Generali was one of the founding members, and remains a member, of ICHEIC.

among our European allies and the State of Israel."); Hearing before the German Bundestag Committee on Domestic Affairs, Berlin, Feb. 16, 2000, Simshauser Decl. in Support of Generali's Motion to Dismiss, filed in *Anderman* action, Ex. 1, at 14 (Eizenstat testimony same as that before Hearing on the Legacies of the Holocaust, cited *supra* ))

Plaintiffs argue that the executive agreements at issue in *Garamendi* do not address claims against Generali, and stress that the United States and Italy have not entered into a comparable agreement governing such claims. (Plaintiffs' Joint Opp'n to Generali's Second Motion to Dismiss at 72; Plaintiffs' Joint Surreply in Opp'n to Generali's Second Motion to Dismiss at 2–4; *Anderman* Plaintiffs' Opp'n to Generali's Motion to Dismiss at 6) However, the *Garamendi* ruling strongly implies that an executive policy need not be formally embodied in an executive agreement in order for the policy to have juridical effect. As discussed above, although the Court found the executive policy favoring ICHEIC resolution to be "expressed unmistakably in the executive agreements signed by the President with Germany and Austria," it found further that "[t]his position, of which the agreements are *exemplars,* has also been consistently supported in the high levels of the Executive Branch, [citing statements by executive officials]." 123 S.Ct. at 2390–91 (emphasis added). Although the agreements were said to be "exemplars" of the Executive's position on

this issue, evidence of that position was not limited to the agreements. Thus, it was to the Executive's position, and not simply to the agreements, that the Court deferred. I believe that the Court's emphasis on the Executive's position rather than merely on the text of the agreements means that a court seeking to comprehend the substance of an executive policy should not confine its analysis to the text of executive agreements. As already discussed, the statements by executive officials concerning disposition of Holocaust-era insurance claims show uniformly that the policy favoring ICHEIC resolution applies to claims against Generali.[8]

That I reached in *Generali I* a somewhat different conclusion—one more favorable to plaintiffs' view here—does not salvage their claims. In that earlier opinion, I declined to give conclusive weight to statements by executive officials endorsing ICHEIC resolution, emphasizing that no executive agreement at issue in this case could be read to preclude litigation of such claims in U.S. courts. *See Generali I,* 228 F.Supp.2d at 358 ("Generali's observation that the United States government has several times expressed its view that ICHEIC 'should be considered the exclusive remedy for resolving insurance claims from the World War II era' [citation omitted] is irrelevant. Absent a statute or executive agreement suspending plaintiffs' claims or an executive agreement that gives rise to specific foreign relations con-

---

8. Plaintiffs are skeptical that statements by executive officials like those at issue here can serve as an independent basis for ascertaining executive policy, and cite to the dissent's view in *Garamendi* that the Court should not "premise [ ] foreign affairs preemption on statements of that order [citing letters by Deputy Secretary Eizenstat] . . . lest we place the considerable power of foreign affairs preemption in the hands of individual sub-Cabinet members of the Executive Branch." (Joint Surreply in Opp'n to Generali's Second Mo-

tion to Dismiss at 3) (citing *Garamendi,* 123 S.Ct. at 2401 (Ginsburg, J., dissent)). However, as discussed above in the text, the majority in *Garamendi* expressly rejected the dissent's position, noting that "there is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is no apparent reason for adopting the dissent's 'nondelegation' rule to apply within the Executive Branch." 123 S.Ct. at 2391 n. 13.

cerns ..., the government's position is not controlling....”). To the extent my earlier ruling conflicts with *Garamendi*, the latter of course controls.

■ Plaintiffs note also that the Executive Branch has not filed in this litigation a statement of interest, or otherwise intervened to support dismissal of their claims. (Plaintiffs' Joint Opp'n to Generali's Second Motion to Dismiss, at 72; Plaintiffs' Joint Surreply in Opp'n to Generali's Second Motion to Dismiss, at 2; Weiss Plaintiffs' Surreply in Opp'n to Generali's Second Motion to Dismiss, at 4–9; Surreply of Plaintiffs Lantos et al., at 2–4) [9] This argument too is of little consequence. Although the Executive Branch is authorized by statute to file a statement of interest in any pending action, *see* 28 U.S.C. § 517 (“The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States.”), it is not required to file a statement in order for the court to take cognizance of its policy. Moreover, to the extent plaintiffs are suggesting that the Government's failure to intervene in this case suggests its ambivalence towards ICHEIC resolution of claims against Generali, that argument

has little to commend it. There is no reason to infer from the mere fact of executive inaction that the policy favoring ICHEIC resolution does not encompass claims against Generali. I note here that the Government's decision to intervene, or not, in a particular case relating to foreign affairs, and what form its intervention should take were it to do so, is informed by a variety of intricate diplomatic and political considerations that make this sort of inferential reasoning by courts a perilous enterprise. *See Chicago & Southern Air Lines v. Waterman S S Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (describing “executive decisions [relating] to foreign policy” as “delicate, complex, and involv[ing] large elements of prophecy”); *Olegario v. United States*, 629 F.2d 204, 232 (2d Cir.1980); *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir.1974) (noting that “[t]he executive's institutional resources and expertise in foreign affairs far outstrip those of the judiciary”) (citing *Waterman S S*, 333 U.S. at 111, 68 S.Ct. 431 (1948); *Curtiss–Wright*, 299 U.S. at 320, 57 S.Ct. 216).

Furthermore, the parties' submissions indicate that, if anything, the Executive Branch's decision not to file a statement of interest in this case appears to stem from an unwillingness to act on behalf of a private company absent a government-to-government agreement encompassing

---

**9.** One minor caveat is that, prior to the MDL Panel's transfer of claims against Generali in the *Anderman* action, the Government filed a statement of interest stating that dismissal of the case would be in the United States' foreign policy interests. (Statement of Interest of the United States of America in *Anderman v. Fed. Repub. of Austria*) As explained in note 3 above, claims against other defendants in *Anderman*—the Federal Republic of Austria and various Austrian companies—were dismissed by the Central District of California. The *Anderman* plaintiffs and Generali dispute whether the statement of interest was filed on behalf of all defendants named in that action, including Generali, or only on behalf of the Austrian entities. (Generali's Mem. in Support of its Motion to Dismiss, filed in *Anderman*, at 13–14; *Anderman* Plaintiffs' Opp'n to Generali's Motion to Dismiss at 6; Generali's Reply Mem. in Support of its Motion to Dismiss, filed in *Anderman*, at 8–9) For the reasons discussed in the text, even assuming the Government filed its statement only on behalf of the Austrian entities, as the *Anderman* plaintiffs contend, that alone cannot be interpreted to mean that the executive policy favoring ICHEIC resolution is inapplicable to the claims against Generali.

claims against the company in question. Thus, when the issue of governmental intervention on behalf of private companies was raised in a November 2000 ICHEIC meeting, ICHEIC Chairman Eagleburger responded as follows:

> If what is essential for the [private] companies is a legal peace that is sought by the United States government, they will not get it. The U.S. government will never agree to go into court on behalf of a specific company.

(Nov. 15–16, 2001, ICHEIC meeting minutes, Weiss Plaintiffs' Surreply in Opp'n to Generali's Motion to Dismiss Ex. 3, at 4) Ambassador James Bindenagel, the State Department's Special Envoy for Holocaust Issues, confirmed Chairman Eagleburger's view, according to the minutes:

> Mr. Bindenagle [*sic*] said the issue is whether the U.S. government would intervene between insurance companies and victims. There is no role for the U.S. government, and there is therefore no place for them to intervene in the way they are intervening in the German Foundation agreement.

(*Id.*) (*See also* Jan. 16–17, 2001, ICHEIC meeting minutes, Weiss Plaintiffs' Surreply in Opp'n to Generali's Motion to Dismiss, Ex. 4, at 2 (recording commission member's comment that "[t]he U.S. Government could not be expected to intervene in the U.S. courts on behalf of Generali, since there was no governmental connection")) In short, the lack of a predicate "governmental connection" appears to explain the Government's decision not to file a statement of interest in the instant lawsuits, not its indifference to whether claims against Generali in particular are handled in the courts. The repeated Executive Branch pronouncements that ICHEIC should be the exclusive remedy for all Holocaust-era claims, discussed above, supports this conclusion. Accordingly, the Government's decision not to file a statement of interest, or otherwise intervene, in this litigation cannot be construed to indicate support for this court's adjudication of plaintiffs' claims.

Plaintiffs' contend as well that ICHEIC's own rules and procedures permit ICHEIC claimants simultaneously to litigate their claims in U.S. courts. (Weiss Plaintiffs' Surreply in Opp'n to Generali's Second Motion to Dismiss, at 9–11; Surreply of Plaintiffs Lantos et al., at 4) However, the relevant inquiry for the purpose of determining whether the laws supporting plaintiffs' claims are preempted is not what ICHEIC's rules permit, but rather what the executive policy is regarding disposition of Holocaust-era insurance claims. Even assuming that ICHEIC's rules grant plaintiffs the simultaneous right to obtain relief in the courts, the policy favoring ICHEIC resolution of Holocaust-era insurance claims requires dismissal of their claims for the reasons discussed above.

Plaintiffs remaining objections were expressly considered and rejected in *Garamendi*, and therefore receive only brief consideration here. They argue that their state law causes of action cannot be preempted because Congress expressly delegated to the States the authority to regulate insurance through the McCarron–Ferguson Act, 59 Stat. 33, ch. 20, 15 U.S.C. §§ 1011–1015. (Plaintiffs' Joint Opp'n to Generali's Motion to Dismiss, at 76) The Court held that that Act cannot be read to condone state laws interfering with federal efforts to resolve Holocaust-era insurance claims. *See Garamendi*, 123 S.Ct. at 2394. Finally, plaintiffs argue that dismissal of their claims is improper because ICHEIC continues to be an inadequate forum for addressing their claims. (Weiss Plaintiffs' Surreply in Opp'n to Generali's Second Motion to Dismiss, at 11–18) However, the Court ruled that concerns about the adequacy of ICHEIC are irrelevant to the

preemption analysis. *See* 123 S.Ct. at 2393 ("[O]ur thoughts on the efficacy of one approach versus another are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress.").[10]

### III.

■ In addition to plaintiffs' core claims predicated on Generali's non-payment of policy benefits, they assert numerous claims alleging other instances of Generali's misconduct—for example, that Generali acted in "bad faith" by "recklessly or intentionally destroy[ing] evidence of the Insurance Policies . . . or fail[ed] to maintain duplicates in a safe location" (*Schenker* Compl. ¶ 72(d)); breached its duty of good faith and fair dealing by "[u]nreasonably asserting a 'nationalization' defense that was misleading, false, and untrue, in claiming that it was not responsible for the Policies because the government had nationalized and expropriated its business in 1945" (*Lightner* Compl. ¶ 27(a)); and engaged in unfair competition by "[u]nfairly, unlawfully, and fraudulently misrepresenting to the General Public, including numerous California residents, that 'very little information and few records regarding policies' exist, when, in fact, [Generali] maintains tens of thousands of these policies in its Trieste, Italy warehouse" (*Szekeres* Compl. ¶ 47(d)). These claims, however, were not brought in a vacuum; they appear to have been made primarily as support for plaintiffs' benefits claims discussed above. In any event, plaintiffs can-

not recover independently on any of these claims because they do not appear to allege any cognizable injury other than that caused by Generali's non-payment of benefits, for which redress is available only through ICHEIC for the reasons discussed above. Should ICHEIC determine that a plaintiff is entitled to the policy benefits he seeks, that plaintiff will have no further cause for complaint. On the other hand, should ICHEIC determine that a plaintiff entitled to no award, or to a smaller award than he seeks, the remaining claims, examples of which are described above, are not independently actionable. Accordingly, plaintiffs' ancillary claims must also be dismissed.

\*　　\*　　\*　　\*　　\*　　\*

For the reasons stated above, Generali's motion to dismiss is granted as to all actions.

### SO ORDERED:

#### *APPENDIX*
PLAINTIFFS' CLAIMS AGAINST GENERALI

| *Named Plaintiff* | *Claims* |
| --- | --- |
| Cornell (class action) | International law (¶¶ 48–51) Breach of insurance policies (52–58) Breach of fiduciary duties (59–64) Breach of duty to disclose (65–67) Conversion (68–70) Bad faith (71–73) Unjust enrichment (74–76) Unfair business practices under N.Y. General Business Law (77–92) Constructive Trust (93–96) Accounting (97–99) |
| Schenker (class action) | International law (63–66) Conversion (67–69) Unjust enrichment (70–71) Breach of insurance policies (72–78) |

**10.** In *Generali I,* I discussed at length the shortcomings of ICHEIC as a venue for processing Holocaust-era insurance claims. *See* 228 F.Supp.2d at 356–58. However, the context of that discussion was Generali's motion to dismiss on *forum non conveniens* grounds. As I explained there, a court considering such a motion must, as one step in its analysis, consider whether a defendant's proposed alternative forum—here, ICHEIC—is an adequate one. *See id.* at 350 (citing *Iragorri v. United Technologies Corp.,* 274 F.3d 65, 73 (2d Cir.2001)). Nothing in *Garamendi* calls into question the prevailing methodology in the Second Circuit for resolving a *forum non conveniens* motion.

| | |
|---|---|
| | Breach of fiduciary duty (79–83)<br>Breach of special duty (84–86)<br>Breach of duty to disclose (87–88)<br>Bad faith (89–90)<br>Conspiracy (91–93)<br>Accounting (94–95)<br>Unfair business practices under N.Y. General Business Law (96–112)<br>Constructive Trust (113–115) |
| David | Breach of Insurance Policies (1–23)<br>Bad Faith (24–25)<br>Unjust Enrichment (26–31) |
| Lightner | Breach of duty of good faith and fair dealing (26–34)<br>Breach of contract (35–38)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (39–47) |
| Szekeres | Breach of duty of good faith and fair dealing (33–41)<br>Breach of contract (42–45)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (46–54) |
| Smetana (class action) | Breach of contract (78–83)<br>Breach of duty of good faith and fair dealing (84–90)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (91–103)<br>Constructive Trust (104–109)<br>Accounting (110–114) |
| Mandil | Breach of duty of good faith and fair dealing (23–31)<br>Breach of contract (32–35)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500) (36–44) |
| Brauns | Breach of duty of good faith and fair dealing (31–39)<br>Breach of contract (40–43)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500) (44–52) |
| Sladek | Breach of duty of good faith and fair dealing (41–48)<br>Breach of contract (49–52)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (53–61)<br>Unjust enrichment (62–67) |
| Weiss | Breach of contract (113–122)<br>Holocaust Victims Insurance Act, Fl. stat. § 626.9543 (123–134)<br>Re-establish papers pursuant to Fl. stat. § 71.011 (135–142)<br>Intentional spoliation of evidence (143–145)<br>Conversion (146–148)<br>Unjust enrichment (149–151)<br>Breach of fiduciary duty (152–155)<br>Constructive trust (156–160)<br>Breach of special duty (161–163)<br>Conspiracy (164–166)<br>Accounting (167–168)<br>Declaratory judgment pursuant to Fl. Statutes, chap. 86 (169–173) |

| | |
|---|---|
| Tabaksman | Breach of contract (30–37)<br>International law (38–42)<br>Breach of fiduciary obligations (43–49)<br>Breach of duty to disclose (50–53)<br>Conversion (54–56)<br>Bad faith (57–60)<br>Unjust enrichment (61–63)<br>Constructive trust (64–68)<br>Accounting (69–71) |
| Haberfeld (class action) | Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500<br>Cal. Admin. Code, Title 10, § 2695.4(a) & (e)(1)<br>Cal. Admin. Code, Title 10, § 2695.7(g) |
| Lantos | Breach of duty of good faith and fair dealing (25–32)<br>Breach of contract (33–36)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (37–45)<br>Unjust enrichment (46–51) |
| More | Breach of duty of good faith and fair dealing (16–23)<br>Breach of contract (24–27)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (28–36)<br>Unjust enrichment (37–42) |
| Pioro | Breach of duty of good faith and fair dealing (16–23)<br>Breach of contract (24–27)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (28–36)<br>Unjust enrichment (37–42) |
| Sorter | Breach of duty of good faith and fair dealing (27–34)<br>Breach of contract (35–38)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (39–47)<br>Unjust enrichment (48–53) |
| Ungar | Breach of duty of good faith and fair dealing (16–23)<br>Breach of contract (24–27)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (28–36)<br>Unjust enrichment (37–42) |
| Weiss/Friedman | Breach of duty of good faith and fair dealing (19–26)<br>Breach of contract (27–30)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (31–39)<br>Unjust enrichment (40–45) |
| Zada | Breach of duty of good faith and fair dealing (16–23)<br>Breach of contract (24–27)<br>Unfair business practices under Cal. Bus. & Prof.Code §§ 17200 and 17500 (28–36) |

Unjust enrichment (37–42)

| Anderman (class action) | Violations of Customary International Law (403–410) |
| | Imposition of a Constructive Trust (418–429) |
| | Unjust Enrichment (435–439) |
| | Conversion (440–443) |
| | Liability for Violations of International Law Under the Alien Tort Claims Act (444–455) |
| | Breach of Contract (456–461) |
| | California Holocaust Victim Insurance Relief Act of 1999 (462–474) |
| | Accounting (475–480) |
| | Disgorgement of Profits Pursuant to Cal. Business Code § 17200 *et seq.* (481–483) |