**FACULTY SENATE OF FLORIDA INTERNATIONAL UNIVERSITY, et. al. Plaintiffs**

v.

**John WINN, et. al. Defendants**

**No. 06–21513–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Feb. 8, 2007.

---

**1202**

Randall C. Marshall, Esq., American Civil Liberties Union Foundation of Florida, Miami, FL, Paul F. Brinkman, Esq., Alston & Bird, Washington, DC, for Plaintiff.

Names & Addresses, Brigida Benitez, Esq., Wilmer Cutler Pickering Hale &

Dorr LLP, Washington, DC, Daniel J. Woodring, Esq., Dennis A. Dean, Attorney General Office, Department of Legal Affairs, Tallahassee, FL, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

JORDAN, District Judge.

On May 30, 2006, then-Governor Bush signed into law the so-called "Travel Act," which had been passed earlier by the Florida legislature. *See* Act Relating to Travel to Terrorist States, 2006 Fla. Sess. Law Serv. Ch.2006–54 (West), codified at various places in the Florida Statutes, including Fla. Stat. §§ 1005.08 & 1011.90(6).[1] As relevant here, the Act provides that "[n]one of the state or nonstate funds made available to state universities may be used to implement, organize, direct, coordinate, or administer, or to support the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state. For purposes of this section, 'terrorist state' is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism." Fla. Stat. § 1011.90(6). The five countries currently designated by the State Department as state sponsors of terrorism are Cuba, Iran, North Korea, Sudan, and Syria (the "designated countries").[2]

This case concerns a challenge to the Act under 42 U.S.C. § 1983 by the Faculty Senate of Florida International University and various university professors and educational researchers. The plaintiffs allege in their first amended complaint that the Act is constitutionally infirm because it

---

1. Similar codifications of the Act may be found at Fla. Stat. §§ 112.061(3)(e) & 1011.81(2).

2. *See* U.S. Department of State, List of State Sponsors of Terrorism (2007), published at *www.state.gov/s/ct/c14151.htm* (last visited January 24, 2007).

violates the Supremacy Clause of the Constitution (Count 1), violates the federal government's foreign affairs power (Count 2), violates the Foreign Commerce Clause of the Constitution (Count 3), and violates the First Amendment to the Constitution (Count 4). Currently pending is the plaintiffs' motion for a preliminary injunction. After considering the parties' submissions, including the oral arguments presented by counsel, the plaintiffs' motion for preliminary injunctive relief [D.E. 17] is DENIED.

### I. LEGAL STANDARD

■ A preliminary injunction may issue only if the movants show that (1) they have a substantial likelihood of prevailing on the merits; (2) they will suffer irreparable harm unless the injunction issues; (3) the threatened injury to the movants outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) the injunction, if issued, would not be adverse to the public interest. *See, e.g., Charles H. Wesley Educ. Foundation, Inc. v. Cox,* 408 F.3d 1349, 1354 (11th Cir.2005); *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983). "The burden of persuasion in all of the four requirements is at all times upon the plaintiff[s]" *Jefferson County,* 720 F.2d at 1519. All four factors must be satisfied because a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *Id.*

■ The determination of whether there is a substantial likelihood of success on the merits "does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Fla. Med. Ass'n, Inc. v. U.S. Dept. of Health, Educ., & Welfare,* 601 F.2d 199, 203 n. 2 (5th Cir.1979). For example, where " 'the balance of equities weighs heavily in favor of granting the [injunction],' the movant[s] need only show a substantial case on the merits." *Gonzalez v. Reno,* 2000 WL 381901, *1 (11th Cir.2000) (citation omitted).

### II. DISCUSSION

■ The Travel Act represents a decision by the Florida Legislature and then-Governor Bush to prohibit the use of state funds (and nonstate funds made available to state universities) to pay for travel (and activities related to travel) to countries which, according to the federal government, are state sponsors of terrorism. Although a spending or funding decision by a state is not insulated from constitutional scrutiny, it is nevertheless entitled to deference. *See Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1344 (11th Cir.1999) (*en banc*).

For the reasons which follow, the plaintiffs have not shown a substantial likelihood of success on the merits. Nor have they demonstrated irreparable harm. Finally, in the exercise of my discretion, I do not believe it is appropriate to temporarily enjoin enforcement of the Act.

### A. THE PLAINTIFFS HAVE NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS

#### 1. THE SUPREMACY CLAUSE

The Supremacy Clause establishes federal law (i.e., the Constitution, federal statutes and regulations, and U.S. treaties) as "the supreme law of the land." U.S. CONST., ART. VI, cl. 2. The plaintiffs argue that federal law preempts the Travel Act because the Act conflicts with federal laws and other regulations concerning the United States' relations with the designated countries. Additionally, the plaintiffs contend that Congress has "occupied the field" and "closed off this area to state

regulation." In other words, the plaintiffs are proceeding on "conflict preemption" and "field preemption" theories. *See This That And Other Tobacco, Inc. v. Cobb County*, 285 F.3d 1319, 1321 (11th Cir. 2002) (explaining these two preemption theories, as well as express preemption, a third preemption theory). *See also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n. 6, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (noting that preemption theories are not "rigidly distinct").

██ **Conflict Preemption.** Conflict preemption "arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir.2004). The plaintiffs argue that the Act intrudes on federal laws that grant the President flexibility and authority to increase or decrease sanctions on Cuba and the other designated countries.

██ I do not believe that the plaintiffs have shown a substantial likelihood of success on their conflict preemption claim. It is true, of course, that a state's use of its spending power does not render a legislative decision immune from a preemption attack. *See Crosby*, 530 U.S. at 373 n. 7, 120 S.Ct. 2288. For example, in *Crosby*, the Supreme Court struck down, under the Supremacy Clause, a Massachusetts law restricting the authority of state agencies to purchase goods from companies doing business with Burma. Using a conflict preemption analysis, the Supreme Court concluded that the law was an "obstacle to the accomplishment of Congress' full objectives" under a federal act imposing mandatory and conditional sanctions on Burma. *See id.* at 373–85, 120 S.Ct. 2288.

The Travel Act stands on a different footing than the law at issue in *Crosby*, as it does not diminish the President's (or Congress') flexibility or authority in the relations the United States has with the designated countries. Florida has not banned travel to or from the designated countries, or imposed sanctions on those who do business with or travel to or from the designated countries. It has only legislated that its funds will not be used for travel to (or activities related to travel to) the designated countries. Individuals may still travel to the designated countries as permitted by the federal government, but will simply have to pay their own way. As the defendants point out, accepting the plaintiffs' conflict preemption argument would require me to adopt the theory that "because federal law *does not prohibit* all travel to the listed countries, states like Florida *must subsidize* this travel to avoid impermissible interference with federal law." I am not aware of one case suggesting that, in order to avoid conflict preemption, a state must pay for an activity that the federal government does not bar. In sum, Florida's decision not to subsidize travel is not in conflict with any of the federal statutes referenced by the plaintiffs, and does not appear (at least not substantially so) to be an obstacle to the ability of the President or Congress to impose (or lessen) sanctions on the designated countries. *See Hughes*, 377 F.3d at 1266 n. 11 (Florida statutes "criminalizing the operation of commercial airlines while intoxicated do not stand as an obstacle to the purpose of [federal statutes criminalizing the operation of a common carrier under the influence of alcohol or any controlled substance] or the federal regulatory scheme, and certainly not in a 'facially conclusive' manner").[3] And once a country

---

**3.** It is probably worth pointing out that travel to the designated countries is, in many respects, highly regulated by the federal government. In the case of Cuba, the Cuban Assets

Control Regulations, enforced by the Office of Foreign Assets Control (a part of the Department of the Treasury), provide that only cer-

is no longer designated by the federal government as a state sponsor of terrorism, the Act no longer will prohibit the use of state funds for travel to that country.

 **Field Preemption.** "Field preemption occurs when federal regulation in a field is so pervasive that [a court] can reasonably infer that there is no room left for the states to supplement it." *Hughes,* 377 F.3d at 1267. In my view, the plaintiffs' field preemption claim is weak.

 The plaintiffs argue that Congress has preempted the field of "sanctions on foreign nations." But, as noted above, the Travel Act does not impose any sanctions on any of the designated countries, or on those dealing with or conducting business with those countries, and field preemption is not inferred "simply because [an] agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). Moreover, the plaintiffs' field preemption argument is also internally contradictory. Field preemption does not depend on the flavor or viewpoint of the state law at issue. If there is field preemption, the result is that the states are not allowed to legislate in the area, no matter what perspectives or policies their laws might embody. Yet the plaintiffs' argument, if correct, would mean that there is field preemption of a state's decision to prohibit the funding of travel to the designated countries, but for some reason not a state's decision to require or allow funding for such travel. I am not persuaded by this argument.

tain classes of persons can travel to Cuba, and only within certain specified parameters. Even where travel is generally allowed, the person wishing to travel must apply for and obtain a license from the OFAC. This license requirement applies, among others, to educators and researchers. *See, e.g.,* 31 C.F.R.

## 2. THE FOREIGN AFFAIRS POWER

 "The exercise of the federal executive authority means that state law must give way where ... there is evidence of clear conflict between the policies adopted by the two." *American Ins. Ass'n v. Garamendi,* 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). Here the plaintiffs have not made a substantial showing of a clear conflict between the Travel Act and the policies of, and sanctions imposed by, the federal government with respect to the designated countries. *Compare, e.g.,* 22 U.S.C. § 6002 *et seq.;* 50 U.S.C. §§ 1701–1707. Although some individuals may elect not to travel to the designated countries if they cannot gain access to state funds to subsidize their trips, the prohibition is merely an "incidental or indirect effect on foreign countries" and does not necessarily render the Act invalid. *See, e.g., Clark v. Allen,* 331 U.S. 503, 517, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947).

In support of their argument based upon the foreign affairs power, the plaintiffs rely principally on *Zschernig v. Miller,* 389 U.S. 429, 432, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), *Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38 (1st Cir.1999), *aff'd on conflict preemption grounds sub nom., Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000), and *Miami Light Project v. Miami–Dade Co.,* 97 F.Supp.2d 1174 (S.D.Fla.2000). The laws at issue in those cases, however, are considerably different than the Travel Act, and the plaintiffs have not shown a substantial likelihood of prevailing on the merits.

§§ 515.563–515.567 (licenses for travel to Cuba). *See generally* U.S. Dept. of State, Bureau of Consular Affairs, Consular Information Sheet on Cuba (2007), published at *http:// travel.state.gov/travel/cis_pa_tw/cis/cis_1097. html* (last visited February 2, 2007).

In *Zschernig,* an Oregon statute conditioned the testamentary disposition of property to non-resident aliens on whether an alien's country of origin would grant reciprocal rights to United States citizens and on whether that foreign country would confiscate the inherited property. Because a determination of these issues would have required inquiries into the "actual administration of foreign law" and "into the credibility of foreign diplomatic statements," the Oregon statute in *Zschernig* had the potential to interfere substantially with the power of the federal government to deal with foreign nations. *See Zschernig,* 389 U.S. at 435, 88 S.Ct. 664.

In *Natsios,* the First Circuit declared unconstitutional a Massachusetts law that prevented a state and its agencies from purchasing goods or services from companies doing business with Burma. The law at issue in *Natsios* had more than an "incidental or indirect effect on foreign countries" because the purpose of the law was to influence the foreign affairs of Burma. Furthermore, the First Circuit determined that the state statute diverged substantially from federal law regulating commerce with Burma. *See Natsios,* 181 F.3d at 52–55.

Finally, in *Miami Light,* Judge Moreno enjoined the application of a Miami–Dade County ordinance that barred the County from contracting with companies which were doing business with Cuba. Judge Moreno ruled that the County was using its contracting requirements to "discourage any form of trade with Cuba" in an effort to "punish Cuba, not protect the citizens of Miami–Dade County." *Miami Light,* 97 F.Supp.2d at 1180.

Unlike the laws at issue in these cases, the Travel Act's denial of the use of state funds to subsidize travel to the designated countries has little more than an incidental or indirect effect on those countries. The Act does not discourage or prohibit any person from engaging in business with any of the designated countries, nor does it prevent any professors, educators, or researchers from traveling to any of the designated countries on their own dime.

Furthermore, the countries covered by the Act are designated as sponsors of terrorism by the federal government, so the countries incidentally affected by the Act will always be congruent with the federal government's designations. It therefore cannot be said—at least not convincingly enough to obtain a preliminary injunction—that Florida, through the Travel Act, is countermanding the general views of the federal government with respect to those countries.

### 3. THE FOREIGN COMMERCE CLAUSE

The plaintiffs also maintain that the Travel Act intrudes on Congress' authority "to regulate Commerce with foreign Nations..." U.S. CONST. Art. I, § 8. In *Garamendi,* 539 U.S. at 414, 123 S.Ct. 2374, the Supreme Court cited an earlier case, *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), for the proposition that the negative Foreign Commerce Clause protects the federal government's ability to speak with "one voice" in regulating commerce with other nations. The Act, however, does not regulate—nor does it even attempt to regulate—commerce with foreign nations, and "there can be no commerce clause intrusion even in a foreign commerce context where there is no attempt to regulate." *Trojan Technologies, Inc., v. Pennsylvania,* 916 F.2d, 903 910 (3rd Cir.1990).

The plaintiffs urge me to find that the Act "regulate[s] conduct outside of [the state] and outside of this country's borders." *Natsios,* 181 F.3d at 67. But the Act only prevents individuals from using state funds to travel to the designated

countries. The plaintiffs have therefore failed to show that they are substantially likely to succeed on their claim that this prohibition on funding is inconsistent with the Foreign Commerce Clause.

### 4. THE FIRST AMENDMENT

The plaintiffs make two principal arguments in support of their First Amendment claim. Because neither is persuasive, the plaintiffs are not entitled to injunctive relief on this claim either.

 First, the plaintiffs contend that Florida's decision not to fund travel to the listed countries penalizes and regulates their speech and expressive conduct. The problem with this argument is that the Supreme Court had already held that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). *Regan* clearly rejected the notion that "First Amendment rights are somehow not fully realized unless subsidized by the state,"*id.* at 546, 103 S.Ct. 1997, and it is not the only case to have done so. *See, e.g., Cammarano v. United States,* 358 U.S. 498, 512–13, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) (upholding a Treasury regulation that denied business expense deductions for lobbying activities); *Maher v. Roe,* 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (upholding state welfare regulation which provided Medicaid recipients with payments for services related to childbirth, but not for nontherapeutic abortions); *Rust v. Sullivan,* 500 U.S. 173, 193, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding federal regulations prohibiting the use of federal funds to counsel pregnant women about abortion as a method of "family planning": "The Government can, without violating the constitution, selectively fund a program to encourage certain activities it believes to be in the public interest."). In

other words, "a refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *Harris v. McRae,* 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). To summarize, Florida has not aimed to chill expressive conduct; rather, it has only precluded state universities (and others) from using state funds to pay for travel (and activities related to travel) to the designated countries. *Cf. Miami Light,* 97 F.Supp.2d at 1181 ("As the master of its purse, Miami–Dade County can selectively choose those programs which it desires to fund.").

 Second, the plaintiffs argue that the Act does not comport with academic freedom as protected by the First Amendment. As Justice Brennan has explained, academic freedom "is [a] special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967). Under Eleventh Circuit precedent, however, academic freedom "is not an independent First Amendment right," *Bishop v. Aronov,* 926 F.2d 1066, 1075 (11th Cir. 1991), and in any event the Act does not cast a "pall of orthodoxy" over the classroom. The Act does not prohibit scholarship about the designated countries, or discussion (in or outside of the classroom) about those countries, their governments, policies, etc. Nor does it prohibit students, faculty members, or researchers from traveling to the countries, or punish them in any way for engaging in such travel. The Act simply establishes that Florida, as a state, will not pay for these excursions. I agree with the Seventh Circuit that "the First Amendment does not require the State, through its university, to provide [faculty members] with facilities and financing for [their] research." *McE-*

*learney v. University of Illinois at Chicago Circle Campus*, 612 F.2d 285, 288 (7th Cir.1979).

### B. THE PLAINTIFFS HAVE FAILED TO SHOW IRREPARABLE HARM

 Irreparable harm is injury for which a "monetary award cannot be adequate compensation." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2nd Cir.1995). The "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). There is no irreparable harm here because the plaintiffs can fund the desired travel themselves and then, if they prevail in this suit, obtain reimbursement. In other words, the harm is financial.[4]

Apparently understanding that the expenditure of money generally is not irreparable harm, the plaintiffs claim two types of harm that they say cannot be redressed by a money judgment. I am not persuaded, however, that either claimed injury is irreparable.

 The plaintiffs assert that their desire to complete their scheduled academic research and educational degrees, if delayed, cannot be remedied by money damages or other relief. The plaintiffs' mere desire to complete research, however, does not amount to irreparable harm under Eleventh Circuit precedent. *Van Arsdel v. Texas A & M University*, 628 F.2d 344, 346 (5th Cir.1980), is particularly instructive. In that case, a professor brought suit against a state university, claiming that he resigned under duress after the university refused to agree to a rescission of his resignation. The professor had resigned after learning from his department head that the university would likely bring

dismissal proceedings against him for sexual harassment unless he resigned. Subsequently, the professor changed his mind about resigning six months before the resignation was to become effective. The district court issued a preliminary injunction requiring the university to reinstate the professor with back pay until it complied with its procedures for dismissal. In so ordering, the district court found that the professor resigned under duress and thus would prevail at trial on the merits. The former Fifth Circuit reversed the district court. It held that because the professor made a reasoned choice between two validly imposed alternatives, duress was absent as a matter of law. More importantly, the district court had made no finding that the professor would suffer irreparable injury if required to wait until a determination after trial that he deserved reinstatement. In other words, reinstatement after trial, coupled with back pay, would suffice to redress the professor's alleged wrong. *See id.* As the defendants correctly posit, if delay in reinstatement to tenure is not irreparable harm, it is unlikely that delay in completing research or obtaining a degree is irreparable harm.

 The plaintiffs also argue that the Act deprives them of their First Amendment rights, and that as a result they have suffered an irreparable injury. The Act, however, does not suppress speech in a manner that irreparably injures the plaintiffs. As the Eleventh Circuit held in *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir.2000) (*en banc*), irreparable injury in a First Amendment case is presumed only where there is an "imminent likelihood that pure speech will be chilled or prevented altogether." In this

---

4. The affidavit of Professor Perez, moreover, says nothing about how much his planned travel to Cuba would cost. And with respect to Professor Sadri, the defendants conceded at oral argument that the Travel Act would not bar the use of state funds for his trip to London to discuss Iranian politics, so at least one of his trips is not affected by the Act.

case, the denial of state funding for professors or others to travel to designated countries to conduct academic research is, at most, an incidental inhibition that does not prevent the expressive activity. *See also Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir.1983) (direct penalization, as opposed to incidental inhibition, of First Amendment rights constitutes irreparable injury).

### C. As A Discretionary Matter, a Preliminary Injunction is not Warranted

▆▆▆▆ "The award of an interlocutory [i.e., preliminary] injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). A court must always balance the equities in determining whether, in the exercise of its discretion, a preliminary injunction is warranted. Exercising that discretion here, and assuming that I am wrong on likelihood of success and irreparable harm, I conclude that the answer is no.

In addition to what I have said above, the federal government was invited to participate in this case, and so far has chosen not to join or support the plaintiffs in their challenge to the Travel Act. I understand, of course, that such lack of participation or involvement is not, in the end, legally dispositive, but it does suggest that the federal government is not too concerned about any obstacles that the Travel Act may pose to the nation's ability to conduct foreign policy with one voice.

This does not mean all questions concerning the Act have been answered. I do not understand, for example, how the Act will be applied to funds donated to state universities by non-state entities or individuals, with certain requirements (or understandings) about how those funds can be used. It is not clear how Florida is going to deal with those donors who might want their money back if the universities benefiting from their largesse are now required—as a result of the Travel Act—to put unwanted (or, from the donors' perspectives, prohibited) strings on the use of those donated funds. Given the somewhat puzzled looks of the defendants' counsel at oral arguments when I raised issues like this one, I doubt very much that Florida or the defendants have given these matters much thought. Florida and its universities may, in the end, have to forego or return certain endowments, grants, or donations as a result of the Travel Act. And this problem may not be limited to private donors. Florida universities receive federal funds, such as research grants, for various purposes. If those grants require use of the funds within certain parameters, such as allowing the funding of trips to the designated countries, it will certainly be interesting to see what happens if Florida tells the federal government that it wants to keep the federal funds but will decide to use them as it (and only it) sees fit.

These matters, however, go to what may be unintended consequences of the Act. They do not affect the constitutionality of the Act, and do not tip the balance in favor of a preliminary injunction. My task is not to opine on whether the Act is good public policy, but merely to determine whether it violates federal constitutional norms.

### IV. Conclusion

The plaintiffs' motion for a preliminary injunction is DENIED. By February 28, 2007, the parties shall file a joint scheduling report.